CENTRAL CUBA SUGAR CO. v. COMMIS-
SIONER OF INTERNAL REVENUE.

COMMISSIONER OF INTERNAL REVE-
NUE v. CENTRAL CUBA SUGAR CO.

No. 225, Docket 22272.

United States Court of Appeals
Second Circuit.

Argued June 4, 1952.

Decided July 7, 1952.

Writ of Certiorari Denied Nov. 10, 1952.
See 73 S.Ct. 167.

Robert A. Littleton, Washington, D. C. (Myles A. Walsh, New York City, on the brief), for Central Cuba Sugar Co., peti- tioner.

Hilbert P. Zarky, Sp. Asst. to Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen., and Lee A. Jackson, Sp. Asst. to Atty. Gen., on the brief), for Commissioner, respondent.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

These are petitions by both the taxpayer Central Cuba Sugar Company and the Commissioner of Internal Revenue for a review of a decision of the Tax Court of the United States, 16 T.C. 882, sustaining in part only a determination by the Commissioner of a deficiency in the taxpayer's income and excess profits taxes for the fiscal years ending June 30, 1942 and 1943. The deficiency as assessed by the Commissioner was $303,621.89 for 1942, and $17,980.49 for 1943; as adjudged by the Tax Court it was $167,467.86 for 1942, and none for 1943. Taxpayer is a New York corporation, formed in 1911. It has since then been engaged in the cultivation, processing, and sale of sugar. Its properties, including land and sugar mills, are entirely located in Cuba, save for a statutory office maintained in New York City. The controlling interests are likewise Cuban. Its accounting practices are based on a fiscal year ending June 30. On November 14, 1942, taxpayer transferred all its assets to the Central Cuba Sugar Company of Cuba under a plan of reorganization within I.R.C. § 112(g), 26 U.S.C.A. § 112(g), in exchange for the transferee's capital stock, which was then distributed to taxpayer's stockholders.

The Commissioner's petition concerns the proper allocation of operation expenses prior to this reorganization. The reorganization had been approved by the Commissioner in July, 1942, under I.R.C. § 112(i) as not motivated solely as a tax-saving device. Following the transfer in November, taxpayer claimed expenses of over $300,000 in its return filed for the fiscal year 1943, and a gross income of only some $50,000, none of which was derived from sales of sugar produced in 1942. It then sought to carry back the resulting reported net loss

of $250,000 to the fiscal year 1942 under I.R.C. §§ 122(b)(1), 23(s), 26 U.S.C.A. §§ 122(b)(1), 23(s). The Commissioner ruled that this could not be done, claiming that $300,000 of the claimed expense deductions should be allocated to its successor concern. Taxpayer assigned this as error to the Tax Court, which held that the Commissioner lacked the asserted power "where a sound reason not primarily related to tax saving was the motivating force of the transaction."

The power to order such an adjustment in the tax accounting of related corporations stems from I.R.C. § 45, 26 U.S.C.A. § 45, providing that where two or more organizations are controlled by the same interests, the Commissioner may apportion income and deductions where it is necessary to prevent evasion of taxes or "clearly to reflect the income of any of such organizations." The Commissioner does not contest the bona fides of the transaction. He does not now controvert his previous finding that the reorganization was not for the purpose of escaping taxes under I.R.C. § 112 (g), nor in fact does he even allege that its timing was more than fortuitous. The claimed reason and justification for the order are rather that to divide the fiscal year in November distorts the true income picture of what was generally an extremely profitable operation. The reorganization occurred at a time when substantial expenses had been incurred "in getting ready for the next spring grinding season," but before the year's crop had been sold and income recorded, which occurs from January to March. Hence the Commissioner contends that irrespective of tax evasion, the reallocation of the deductions was necessary and proper under I.R.C. § 45 "clearly to reflect the income."

We agree. This is an independent reason for reallocation and has been traditionally cited as such. Asiatic Petroleum Co. v. C.I.R., 2 Cir., 79 F.2d 234, certiorari denied 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459; Jud Plumbing & Heating Co. v. C.I. R., 5 Cir., 153 F.2d 681; U.S.Treas.Reg. 111, § 29.45–1(c).[1] The Tax Court's as-

---

1. But cf. Cooper, Section 45, 4 Tax L.Rev. 131, 157–158.

sumption of the necessity of finding some ulterior motivation—traditionally a thankless task in tax cases and one to be avoided if possible—was error.

■ In addition, the invocation of I.R. C. § 45 in these circumstances to deny taxpayer claimed expense deductions was entirely proper. The section had its genesis in provisions for consolidation of returns or accounts. Revenue Act of 1921, § 240(d), 42 Stat. 227; Revenue Act of 1926, § 240 (f), 44 Stat. 9.[2] Needless to say, consolidation would have shown the income which accrued during the fiscal year for the enterprise as a whole. Allocation, likewise, should be able to dissolve the fiction that it was unprofitable; Congress, in adopting the original § 45, Revenue Act of 1928, 45 Stat. 791, certainly intended it as a device of comparable utility. The present statute was designed to deny the power to shift income or deductions arbitrarily among controlled corporations, and to place such corporations rather on a parity with uncontrolled concerns. U.S.Treas.Reg. 111, § 29.45–1(b). In the case at bar, had the taxpayer sold its assets, including a crop of sugar about to be harvested, in an arm's-length transaction, the temporarily invested expenses would have been recouped as part of the purchase price. See U.S.Treas.Reg. 111, § 29.45–1(a)(6). But in a sale for stock between related corporations, no such income is recorded and the accounts of the transferor cannot properly reflect the true income status of the enterprise as a going concern. Hence, to achieve "the rough matching of expenses and income previously attained," United States v. Lynch, 9 Cir., 192 F.2d 718, 721, allocation of the expenses to the concern which is to profit by them is the only alternative. See Standard Paving Co. v. C.I.R., 10 Cir., 190 F.2d 330, certiorari denied 342 U.S. 860, 72 S.Ct. 87. The situation is closely analogous to Jud Plumbing & Heating Co. v. C.I.R., supra, where the income from long-term contracts was attributed to the corporation, despite the fact that it had transferred its assets, including such contracts, to its principal stockholder and gone out of business. See also Leedy-Glover Realty & Insurance Co. v. C.I.R., 5 Cir., 184 F.2d 833; Miles-Conley Co. v. C.I.R., 4 Cir., 173 F.2d 958. The Commissioner is therefore entitled to the review he seeks.

The taxpayer's petition raises two issues: one concerning the deductibility of a certain interest claim for the fiscal years 1940, 1941, and 1942, the other as to the year in which certain expense items properly accrued for tax purposes. As to the items of interest, it appears that during the years in question, and for some time prior thereto, taxpayer had been indebted to a certain Securities & Real Estate Company, in the amount of about $8,700,000. Part of this debt bore interest at 5%, the rest at 3%. Securities was owned by the same persons who owned and controlled taxpayer. In 1934, Cuba declared a general moratorium on debts, and provided that all those in excess of $800,000 were to bear interest at the rate of 1% only. In 1941, by decree implementing the moratorium, it was also provided that the debtor could relinquish the benefit of the law.

For the fiscal years ending June 30, 1940, and June 30, 1941, taxpayer paid and deducted as interest on its tax return about $87,000, or one per cent of the total indebtedness. During the fiscal year ending June 30, 1942, it paid a like amount as interest and also paid some $500,000 of the principal. But on June 29, 1942, it entered into an agreement with Securities, the creditor, purportedly waiving the moratorium benefits, retroactively reinstating its original interest obligation of 3% and 5% for the years 1940, 1941, and 1942, and reallocating the principal payments as interest for those years. It now seeks to carry forward a net operating loss for 1940 and 1941 based on the increased interest deduction for those years, and to claim an interest deduction for 1942 of $340,000.

■ We think the Tax Court eminently correct in denying the claim. Accrued

2. The history of Section 45 is set out in National Securities Corp. v. C. I. R., 3 Cir., 137 F.2d 600, certiorari denied 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479; Asiatic Petroleum Co. v. C. I. R., 2 Cir., 79 F.2d 234, certiorari denied 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459.

interest can be deducted only when and to the extent that there exists a legally binding obligation to pay it, fixed in all its terms within the taxable year. Security Flour Mills Co. v. C.I.R., 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Dixie Pine Products Co. v. C.I.R., 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 420; Spencer, White & Prentis v. C.I.R., 2 Cir., 144 F.2d 45, certiorari denied 323 U.S. 780, 65 S.Ct. 269, 89 L.Ed. 623. The purported agreement can have no effect on the tax liability for the years prior to which it was adopted, the fiscal years 1940 and 1941; because under the moratorium, taxpayer's obligation was limited to $87,000, only interest in that amount could validly accrue. And as to the fiscal year 1942, we think the agreement far too insubstantial and unrealistic to constitute an economic factor on which to base federal tax consequences. It was made between parties whose controlling interests were identical. Only one would benefit federal taxwise from any paper adjustment in the terms of the indebtedness. And it was entered frankly with the sole aim of reducing these taxes. As has been often pointed out in the application of I.R.C. § 23(b), it is the actualities of the relationship between the parties that control; the label "interest" is not alone sufficient. C.I. R. v. Schmoll Fils Associated, 2 Cir., 110 F.2d 611, 613.

■ The taxpayer also takes issue with the Tax Court's determination that certain claimed items of expense were not deductible during the fiscal year 1942. These expenses were incurred as to sugar produced, ground, bagged, stored, and sold prior to June 30 of that year, but not shipped and paid for by the purchaser until later. The largest is $126,828.42 for storage of sugar on hand as of that date. The Commissioner concedes that there should be a remand to the Tax Court for determination of the portion of this figure incurred for actual housing of the sugar in bags during the fiscal year 1942. Lighterage, however, cannot be deducted as part of this item. This is an expense which does not accrue properly until the service is actually performed.

The Tax Court was correct in disallowing the claimed item for "weighing, mending bags, and polarizing sugar for shipment." This operation occurs at the time of shipment, and not when the sugar is placed in storage, and hence the expense is properly allocable to the fiscal year in which the service is performed.

■ The final item of brokerage commissions perhaps requires fuller discussion. The commissions claimed as an expense for the fiscal year 1942 were those payable on contracts of sale entered into between taxpayer and purchasers of sugar during that year, but pursuant to which the sugar was not delivered and payment received until later. Taxpayer generally kept its accounts on an accrual basis. Income from sales of sugar was accrued as of the date of sale, though perhaps not received until after the end of the fiscal year of production.[3] We think the expenses of the sales, including commissions, should likewise be accrued during that year, despite the fact that they, too, were not payable until delivery. The Commissioner contends that the deduction should not be allowed because the obligation to pay was too indefinite. It appears that the commission expenses, like the final settlement price, were subject to some adjustment in accordance with final weighing just prior to shipment, and, moreover, that if the contract were not carried out the broker forfeited his commission. The Commissioner contends that Spencer, White & Prentis v. C.I.R., supra, and Capital Warehouse Co. v. C.I. R., 2 Cir., 171 F.2d 395, apply. We interpret these cases as requiring only an established liability, however, in accord with United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, and Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010. Here the services had been performed, and the possibility that some of the contracts might not finally be executed was, if anything,

---

3. It was even taxpayer's practice to accrue income from sugar produced but not sold during the fiscal year of production in accordance with market prices. However, in 1942 the entire crop was disposed of prior to June 30.

a condition subsequent to payment by taxpayer. And the adjustments of the commissions in accordance with the final weight of the sugar shipped were insubstantial.[4] Where the amount of the obligation and its final payment is so certain as here, it would seem the height of business judgment and tax wisdom to establish a reserve and deduct the expense thus set aside in the year in which the related income accrues.[5] The case falls squarely within the principles laid down in Harrold v. C.I.R., 4 Cir., 192 F.2d 1002, and Ohmer Register Co. v. C.I.R., 6 Cir., 131 F.2d 682, 143 A.L.R. 1164.

On the Commissioner's petition the decision is reversed and the proceedings are remanded for computation of the taxes on the basis of allocation of expenses as made by the Commissioner. On the taxpayer's petition the decision is affirmed except as to storage expenses and brokerage fees properly accruing to the taxpayer during the fiscal year 1942; as to those, the decision is reversed and the proceedings remanded for their determination and deduction.

4. A member of petitioner's accounting department testified as follows:

"Q. Now, wasn't the amount that you received dependent somewhat on the polarization of the sugar? A. Well, the polarization doesn't make—doesn't amount to much.

"Q. It was dependent upon that was it not? A. Yes. You may not be sure.

"Q. In other words, your sugar hadn't polarized 96 degrees? A. That is right.

"Q. If it varied from that, adjustment had to be made in the price? A. That is correct.

"Q. Was the broker's commission fixed on the final price as adjusted? A. That is right."

5. 1 Montgomery's Federal Taxes, Corporations & Partnerships, 1951–1952, 535–536.