107 T.C. No. 17

UNITED STATES TAX COURT

THE CHARLES SCHWAB CORPORATION AND INCLUDABLE SUBSIDIARIES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket No.  1271-92.                    Filed November 14, 1996.

        P, an accrual basis taxpayer, provides discount
securities brokerage services for which it earns a
commission fee.  As a discount broker, P does not
engage in activities, such as research and portfolio
management, that are normally conducted by a full-
service broker.  P executes a customer's order to buy
or sell securities on the trade date, but the
securities are not actually transferred and payment is
not due until the settlement date, which was generally
5 days after the trade date.  Between those dates, P
performs certain functions to record, confirm, and book
the customer's trade.

        P commenced business in the State of California on
Apr. 1, 1987.  P deducted its California franchise
taxes based on income for its first year ended Dec. 31,
1987, on its Federal income tax return for the taxable
year ended Mar. 31, 1988.  P then changed to a calendar
year for Federal income tax purposes and is attempting
to deduct its California franchise taxes based on

income for its second year on its Federal income tax return for the taxable year ended Dec. 31, 1988.

Held:  Under the "all events" test, P must accrue commission income for the purchase or sale of securities on the trade date as opposed to the settlement date.

Held, further:  Under California law, P's liability for franchise taxes based on its income during its second year ended Dec. 31, 1988, was fixed on that date.  Sec. 461(d), I.R.C., which would act to disallow the accrual of State taxes "to the extent that the time for accruing taxes is earlier than it would be but for any action of any taxing jurisdiction taken after December 31, 1960" does not apply because under California law as it existed prior to Dec. 31, 1960, all events fixing P's liability for franchise tax based on income earned during its second year would have accrued on Dec. 31 of its second year.

Philip C. Cook, Terence J. Greene, Timothy J. Peaden, Karen S. Sukin, Ben E. Muraskin, Michelle M. Henkel, Glenn A. Smith, Michael R. Faber, Teresa A. Maloney, for petitioner.

Usha Ravi, Steven A. Wilson, and Emily Kingston, for respondent.

RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ending March 31, 1988, and December 31, 1988, in the amounts of $16,136,176 and $12,146,497, respectively.

After concessions, the issues remaining for decision are: (1) Whether petitioner must accrue brokerage commission income on the date a trade is executed or on the settlement date; and (2)

whether petitioner is entitled to a deduction for its California franchise tax liability in the amount of $932,979 on its Federal income tax return for the 9-month period ending December 31, 1988.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts are incorporated herein by this reference. At the time its petition was filed, petitioner's principal place of business was located in San Francisco, California.

Petitioner is a consolidated group consisting of The Charles Schwab Corp.; its first-tier subsidiary, Schwab Holdings, Inc.; and its second-tier operating subsidiary, Charles Schwab & Co., Inc. Petitioner provides discount securities brokerage and related financial services, primarily to individuals, throughout the United States. During the years in issue, petitioner was a member of all major U.S. securities exchanges and had software links with all registered U.S. securities exchanges, major dealers, the National Securities Clearing Corp., and the Depository Trust Co. During the relevant years, petitioner filed

consolidated Federal income tax returns and computed its taxable income under the accrual method of accounting.

Charles Schwab & Co., Inc., the operating subsidiary, was incorporated in 1971 as the First Commander Corp. under the laws of the State of California. First Commander Corp. changed its name to Charles Schwab & Co., Inc. (Schwab & Co.), in 1973 after Charles R. Schwab became its owner and chief executive officer.

Schwab & Co. initially conducted a retail securities brokerage business from a single office in California and published an investment advisory newsletter. In 1974, Schwab & Co. took advantage of a trial period during which the Securities & Exchange Commission (SEC) permitted discounts on securities commissions. On May 1, 1975, the SEC abolished fixed commission rates, and Schwab & Co. engaged exclusively in discount securities brokerage transactions by focusing its marketing efforts on investors who wished to conduct their own research, make their own investment decisions, and avoid paying brokerage commissions for research, advice, and portfolio management.

In November 1982, Schwab & Co.'s parent company, Schwab Holdings, Inc. (which, at that time, was called The Charles Schwab Corp.), agreed to merge into BankAmerica Brokerage Co. (BBC), a wholly owned subsidiary of BankAmerica Corp. (BankAmerica). As a result of the merger, Schwab & Co. became a wholly owned subsidiary of BBC. In January 1983, BBC changed its name to The Charles Schwab Corp.

On March 31, 1987, Charles R. Schwab, through CL Acquisition Corp. (currently known as The Charles Schwab Corp.), purchased from BankAmerica the stock of The Charles Schwab Corp. (formerly BBC and currently known as Schwab Holdings, Inc.), and its wholly owned subsidiary, Schwab & Co., in a management-led leveraged buyout.

Commission Income Issue

One of petitioner's primary sources of revenue is commission income, which is earned by effecting sales and purchases of stocks and other securities for its customers in a rapid, efficient, and cost effective manner.

The primary service performed by petitioner in effecting sales and purchases of stocks and securities on behalf of customers is the execution of trade orders.  Petitioner does not engage in many of the other activities in which full-commission, full-service brokerage firms engage, such as underwriting, market-making, arbitrage, research, and portfolio management. Petitioner also does not solicit transactions in any particular security and does not offer investment advice to its customers about the nature, potential value, or suitability of any particular security.  Nor does petitioner exercise any discretionary authority over customer accounts or, with certain limited exceptions, engage in principal transactions in any security.

Petitioner's strategy is to serve self-directed customers, focusing on those who do not need or want to pay, through commissions, for research, investment advice, or portfolio management. As a result, a customer could save up to 76 percent compared to rates charged by full-commission brokers. By concentrating on unsolicited transactions on an agency basis, petitioner substantially avoids the risk of losses and liabilities faced by full-commission firms that engage in investment banking, underwriting, market-making, arbitrage, and other advisory and principal activities. Moreover, petitioner's customers are not assigned to a particular representative but, instead, may trade with any available representative. As a result, the departure of a registered representative from petitioner does not typically result in a loss of customers.

The "trade date" is the day a trade occurs. On this day, a customer's order is executed by locating a seller or purchaser for securities on terms acceptable to the customer. The date on which petitioner settles the accounts of a customer whose order to buy or sell securities has been executed is termed the "settlement date". Settlement is the process of transferring payment from buyer to seller and certificates from seller to buyer. When customers buy securities, petitioner must receive the full confirmed amount due no later than the settlement date. When customers sell securities, petitioner must receive the stock certificates, properly endorsed, by the settlement date.

In 1988, there was no Federal rule that mandated a specific settlement cycle for securities transactions.[1]  Instead, the settlement cycle in the United States varied among markets and was largely a function of market custom, exchange rules, and industry practice.  The rules of the New York Stock Exchange, however, required transactions to be settled no later than the fifth business day after the trade date.

After a customer's order is received, petitioner transmits the order to the exchange floor for execution via the exchange's system or through floor brokers.  A report of execution, which lists the transactions in terms of shares purchased or sold, but not by customer name or account number, is returned to the firm as a trade record.  After the trade is executed and while the customer is still on the telephone, petitioner can verbally confirm the execution for "market" orders[2] placed via telephone while the markets are open.  The price paid or received by the customer for the purchase or sale of securities is determined according to the market price in effect on the trade date.

Petitioner must perform a series of functions after the order is placed and the trade executed.  These functions, which

---

[1]See infra note 4.

[2]A "market" order is an order from a customer to buy or sell securities as soon as practicable at the then-current market price.  This is in contrast to a "limit" order, which is an order to buy or sell securities when the market reaches a price level specified by the customer.

are performed up until settlement, consist of (i) recording, (ii) figuration, (iii) confirmation, (iv) comparison, and (v) booking.

In the recording function, each transaction is coded, and each trade is assigned a number that identifies the issuer and the issue. The place of execution (i.e., a stock exchange) is also coded along with any other details needed to process the trade properly.

In the figuration function, petitioner computes the contract money, commission to be earned, taxes, fees, and all other related money amounts associated with the trade during nightly batch processing on the day the trade is executed. The net is the amount that the customer must pay in the case of a purchase or is entitled to receive in the case of a sale. The results of the figuration function are available, in written format, on the morning following the trade date. In addition, petitioner can apprise a customer of the commission cost of any trade at the time of the execution of the trade by accessing a computer screen designed to compute commissions on customer trades.

The confirmation function involves mailing a written notification to the customer, usually on the first business day after the trade is executed. The confirmation serves as an invoice and written notification of the trade. The confirmation contains the following information: (1) A description of the trade, including the name of the security, quantity, execution price, settlement money, commission, and other fees; (2) trade

date; (3) settlement date; (4) place of execution; (5) capacity in which the firm acted; (6) customer's name and address; (7) customer's account number; (8) type of customer account; and (9) the amount due.  Petitioner also encloses a remittance stub and a return envelope with the confirmation.

The comparison function, which is required by the National Association of Securities Dealers, Inc., and which generally begins on the first day following the trade date, is the process by which customers' trades are balanced or reconciled against the opposing brokerage firm's transactions.  This is done through the clearing facilities of the exchanges where petitioner holds memberships.  In addition to the broker-to-broker comparison, petitioner also compares the report of execution to its trade record, which represents the customer's order.

Petitioner and the clearing facility attempt to resolve "uncompared trades" (i.e., those trades whose terms do not match or compare in some respect between petitioner and the opposing firm) by the next business day following the execution of a customer order.  However, the resolution of open items continues until all trades are balanced, which may not occur until the settlement date, to ensure that petitioner is not undergoing any undue risk.  If petitioner has an uncompared trade that was unreconciled, it will be required to enter the marketplace and buy or sell to cover the trade.

In the booking function, the customer's transaction is entered on petitioner's records, including the recording of fees and commissions due to petitioner.

Unlike many other discount brokers, who depend on third-party vendors, petitioner performs all execution, clearing, and account maintenance functions for its customers.  This enables petitioner to gain greater control over the quality of customer service and to retain free credit balances and securities for use in margin lending.

On the settlement date, petitioner physically effects the delivery of the securities and receipt of the sale price, in the case of a sale, or receipt of the securities and delivery of the purchase price, in the case of a purchase.  When a customer of petitioner sells securities that are not held by petitioner in street name,[3] the certificates must be properly endorsed and received by petitioner by settlement date.  If a customer of petitioner already has sufficient funds in his or her account, petitioner automatically uses these funds on the settlement date to pay for securities purchased, even though the confirmation indicated an amount due.  If petitioner does not receive payment for securities purchased by the customer by the settlement date,

---

[3]Securities are said to be carried in "street name" when they are held in the name of the broker instead of the customer's name.  Holding securities in street name allows for ease of transfer by the broker and convenience to the customer, because it avoids the necessity of obtaining the customer's endorsement to transfer the security.

petitioner reserves the right to cover the position, and the customer is responsible for any loss resulting from the execution of the trade order.

A security is not debited or credited to the customer's account until the actual settlement date. The settlement date is also important for purposes of determining who is entitled to receive dividends paid on stock and interest that has accrued on bonds. Dividends are paid to the holders of record (i.e., those persons in whose name the stock is registered). If a transaction occurs, but does not settle prior to the dividend record date or if the security is not re-registered in the new name by the record date, the buyer is not entitled to the dividend. Bonds trade at market price plus accrued interest. Interest continues to accrue to the bond's seller up to, but not including, the settlement date.

As a general rule, petitioner does not permit cash and next-day orders. In the event of customer hardship, such as a medical emergency or an escrow closing, however, proceeds from a sale can be paid to a customer prior to settlement. In such instances, the customer is charged a special prepayment fee of the greater of $10 or 0.2 percent of principal in addition to the standard commission for the trade.

There was generally a 5-day delay between the trade and settlement dates. The 5-day delay between the trade and settlement dates allows sufficient time to reflect the trade in

petitioner's books and records and to deliver the securities. The securities clearance and settlement system is exposed to several sources of risk including market risk, participant or credit risk, and external risk, such as a domestic or international event. A reduction of the time between trade execution and settlement can make the settlement cycle safer, but such reduction is not without obstacles, which would require changing established settlement practices and educating retail and institutional investors.[4]

Mistakes can occur in placing the customer order, such as trading the wrong security or quantity of securities, selling the security when instructed to buy and vice versa, or performing figuration incorrectly. Petitioner determines if the error is a representative error or a customer error by reviewing a tape recording of the telephone order, if available.

---

[4]The SEC adopted a new rule under the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, which establishes a 3-business-day settlement period for broker-dealer trades, effective June 1, 1995. 17 C.F.R. sec. 240.15c6-1 (1996). The new rule is designed to: (i) Reduce settlement risk, the risk to clearing corporations, their members, and public investors inherent in settling securities transactions by reducing the number of unsettled trades in the clearance and settlement system at any given time; (ii) reduce the liquidity risk among the derivative and cash markets and reduce financing costs by allowing investors that participate in both markets to obtain the proceeds of securities transactions sooner; and (iii) facilitate risk reduction by achieving closer conformity between the corporate securities markets and Government securities and derivative securities markets that currently settle in fewer than 5 days. 58 Fed. Reg. 52891 (Oct. 13, 1993).

No customer of petitioner can cancel an order that is executed in accordance with the customer's instructions. If petitioner made an error, the customer is made whole by canceling the transaction and rebilling it. When transactions are canceled and rebilled, new trade confirmations are generated and sent to the customer, showing both the canceled trade information and the corrected trade information. When petitioner cancels and rebills a customer for a trade that it incorrectly executed, the customer is liable only for the amount determined according to circumstances existing on the original trade date.

Individual trades may be canceled if an entire transaction is canceled. For example, a customer's trade would be canceled if an initial public offering were canceled after trading was initiated. In these instances, the trades never settle and petitioner collects no commission.

For the taxable year ended December 31, 1988, petitioner accrued commission income on the purchase or sale of securities on the settlement date for tax and book purposes. Petitioner's trades that were executed in 1988, but settled in 1989, resulted in $3,357,576 net commission income.

Franchise Tax Issue

Petitioner qualified to do business in California on February 9, 1987. Petitioner commenced business in California on April 1, 1987.

Petitioner elected a calendar taxable year for California income and franchise tax purposes. Petitioner's first Federal taxable year ended on March 31, 1988, but petitioner changed its Federal taxable year to a calendar year for its second and subsequent years.

Petitioner reported California franchise tax in the amount of $879,500 on its first California Franchise or Income Tax Return (Form 100) for the income year ending December 31, 1987, and paid such amount with its return. Petitioner deducted this amount on its Federal return filed for the taxable year ended March 31, 1988.

For the income year ending December 31, 1988, petitioner reported California franchise tax in the amount of $932,979 on its second California Franchise or Income Tax Return (Form 100) and paid such amount with its return. On its Federal return filed for the taxable year ended December 31, 1988, petitioner did not deduct the franchise tax that it paid for California income year 1988. Petitioner now claims that this was an error and that it should be entitled to deduct the 1988 franchise tax for its taxable year ended December 31, 1988.

OPINION

Commission Income Issue

The first issue we must decide is whether petitioner, an accrual basis taxpayer, must accrue brokerage commission income

on the trade date or on the settlement date.  Neither party cites, nor did we find, any cases directly on point.[5]  The question of when an accrual basis securities broker must accrue commissions earned on securities transactions appears to be one of first impression.

Petitioner kept its books and records and filed its income tax returns using the accrual method of accounting.  Under the accrual method, income is to be included for the taxable year when (1) all the events have occurred that fix the right to receive such income, and (2) the amount can be determined with reasonable accuracy.  Secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs.  The parties do not dispute that the second prong of the test--that the amount of the commissions can be determined with reasonable accuracy--is met as of the trade date.  Our discussion is thus limited to whether petitioner had a fixed right to receive the commission income as of that date.

Under the all events test, it is the fixed <u>right</u> to receive the income that is controlling and not whether there has been actual receipt thereof.  <u>Spring City Foundry Co. v. Commissioner</u>, 292 U.S. 182, 184-185 (1934).  The taxpayer's right to receive income is fixed upon the earliest of (1) the taxpayer's receipt

---

[5]We note that in Rev. Rul. 74-372, 1974-2 C.B. 147, the IRS ruled that a stock brokerage business using the accrual method of accounting must accrue commission income on the trade date, rather than on the settlement date.  Respondent's position herein is consistent with this ruling.

of payment, (2) the contractual due date, or (3) the taxpayer's performance.  See Schlude v. Commissioner, 372 U.S. 128, 133, 137 (1963); Cox v. Commissioner, 43 T.C. 448, 456-457 (1965).  An accrual basis taxpayer must report income in the year the right to such income accrues, despite the necessity for mathematical computations or ministerial acts.  Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 295-297 (1932); Dally v. Commissioner, 227 F.2d 724 (9th Cir. 1955), affg. 20 T.C. 894 (1953); Resale Mobile Homes, Inc. v. Commissioner, 91 T.C. 1085, 1095 (1988), affd. 965 F.2d 818 (10th Cir. 1992).  Moreover, the fact that a taxpayer cannot presently compel payment of the money is not controlling.  Commissioner v. Hansen, 360 U.S. 446, 464 (1959).

Petitioner argues that its commission is earned when delivery of the securities and payment of the purchase price occur, which is not until the settlement date.  According to petitioner, the acts that it performs between the trade date and the settlement date are not merely ministerial.  Rather, they are integral parts of the service for which it is paid a commission, and they represent a substantial percentage of the total discount brokerage services provided.  Respondent, on the other hand, argues that execution of an order on behalf of a customer is the essential service that petitioner performs and is the time at which petitioner's right to receive, and the customer's obligation to pay, the commission arises.  According to

respondent, all the actions that remain to be performed by petitioner after the trade date are of a ministerial nature to effectuate the mechanics of the transfer and are merely in confirmation of the trade executed.  We agree with respondent.

Petitioner is a member of all major U.S. securities exchanges.  The essential service that petitioner provides to its customers is the execution of trades through its access to the securities exchanges.  It is through this access that the customer acquires the ability to make a trade.  Indeed, petitioner's statement of Terms and Conditions, which states the agreement between petitioner and the customer, provides that petitioner "executes orders for securities only and does not give investment advice."  There is no mention of posttrade services, such as recording, confirmation, or booking.

Moreover, the price of the securities that a customer purchases or sells and the amount of commission due to petitioner are determined as of the trade date.  If petitioner does not receive payment on a purchase or sale order executed for the customer, it liquidates the customer's account to collect the amount, including the commission, determined on the trade date. Upon execution of a customer order, a written confirmation is generated automatically and is sent to the customer on the next business day following the trade date.  The written confirmation serves as an invoice and as written notification to the customer of the trade.  The confirmation statement itemizes the total cost

of the trade, including the amount of the commission, and lists the total "amount due". Petitioner encloses a remittance stub and a return envelope with the confirmation. The customer does not have the right to cancel an order that petitioner executes in accordance with the instructions of the customer.

In applying the all events test, this and other courts have distinguished between conditions precedent, which must occur before the right to income arises, and conditions subsequent, the occurrence of which will terminate an existing right to income, but the presence of which does not preclude accrual of income. Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 217-218 (2d Cir. 1952), affg. in part and revg. in part 16 T.C. 882 (1951); Wien Consol. Airlines, Inc. v. Commissioner, 60 T.C. 13, 15 (1973), affd. 528 F.2d 735 (9th Cir. 1976); Buckeye Intl., Inc. v. Commissioner, T.C. Memo. 1984-668; see also Resale Mobile Homes, Inc. v. Commissioner, 965 F.2d 818, 824 (10th Cir. 1992), affg. 91 T.C. 1085 (1988).[6]

We think the above factors indicate that petitioner's execution of a trade for a customer is a condition precedent that

_____

[6]Although Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 217-218 (2d Cir. 1952), affg. in part and revg. in part 16 T.C. 882 (1951), Wien Consol. Airlines, Inc. v. Commissioner, 60 T.C. 13, 15 (1973), affd. 528 F.2d 735 (9th Cir. 1976), and Buckeye Intl., Inc. v. Commissioner, T.C. Memo. 1984-668, involved the accrual of deductions rather than the proper reporting of income, this Court has recognized that similar considerations apply with respect to both issues. See Simplified Tax Records, Inc. v. Commissioner, 41 T.C. 75, 79 (1963); Buckeye Intl., Inc. v. Commissioner, supra.

fixes petitioner's right to receive the commission income. The functions that remain to be performed by petitioner after the trade date are of a ministerial nature to effectuate the mechanics of the transfer and confirm the trade executed. Although failure to perform these functions may ultimately divest petitioner of its right to the commission income, we think that these functions are conditions subsequent and, therefore, do not preclude accrual of commission income on the trade date.

Nor does the possibility that an executed trade may not settle due to cancellation of an entire public offering make petitioner's right to the commission income too indefinite or contingent for accrual. See Brown v. Helvering, 291 U.S. 193, 199-200 (1934) (holding that overriding commissions received by a general agent for policies written must be accrued even though there was a contingent liability to return a portion of the commission in the event the policy was canceled); Georgia School-Book Depository, Inc. v. Commissioner, 1 T.C. 463, 468-470 (1943) (holding that a book broker that represented publishers in sales of school books to the State of Georgia must accrue commission income, despite the fact that the State was obligated to pay for the books only out of a particular fund, and, during the years in issue, the fund was insufficient to pay for the books in full). The possibility that a trade might not finally be settled is, if anything, a condition subsequent to the execution of the trade, which was the event that fixed petitioner's right to the

commission.  See Central Cuba Sugar Co. v. Commissioner, supra at 217-218 (holding that sales commission expenses were deductible in the year the taxpayer entered the contract for sale even though they were not payable until delivery, and even though the commission expenses were subject to adjustment in accordance with final weighing before shipment and forfeiture if the contract were not carried out).

Petitioner argues that unlike full-commission securities brokers who engage in a full range of activities, such as research and portfolio management, the functions performed by petitioner between the trade and settlement dates represent a substantial percentage of the services provided by petitioner to its brokerage customers.  According to petitioner, the commission income received by petitioner does not represent payment for investment advice or other pretrade services, but rather is a fee for the specific services of executing the transaction and handling the mechanics of the transfer of title and delivery on the settlement date.  Therefore, petitioner argues, even if the posttrade activities conducted by a full-commission broker are considered ministerial, they cannot be considered ministerial when performed by a discount broker such as petitioner.

While we appreciate the differences in the services provided by full-commission and discount brokers, we cannot agree that ministerial acts that constitute conditions subsequent to a customer's obligation to pay commissions are converted to

conditions precedent merely because they may comprise a significant percentage of the overall activities conducted by the broker.

Petitioner argues that this case is governed by Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26 (1988). In Hallmark, a manufacturer and seller of greeting cards shipped its Valentine merchandise to customers in the year prior to that in which the holiday occurred. The terms of the sale specified that title and risk of loss did not pass to the customer until January 1 of the year following the shipment. This Court held that the taxpayer's right to income from the sale became fixed only upon passage of title and risk of loss to the purchasers, notwithstanding that delivery of the goods had occurred earlier. Id. at 32-33. Petitioner argues that because title to the securities does not pass, and petitioner is not relieved of its risk of loss until the settlement date, its right to the commission income is not fixed until the settlement date.

Hallmark v. Commissioner, supra, is distinguishable from the instant case. In Hallmark, the taxpayer was a manufacturer and seller of goods. Thus, passage of title and risk of loss constituted the essence of the transaction; without such passage, no sale occurred. Conversely, the present case involves a service provider that executes securities trades as an agent of its customers. We think that the focus in this case must be on the contractual relationship between petitioner and its customer,

not on the relationship between the customer and the purchaser or seller of the securities.[7] The agreement between petitioner and its customers was that any trade executed by petitioner in accordance with the customer's instructions could not be canceled. In contrast, the customer in Hallmark had the right to return the merchandise without penalty until title passed. Id. at 33. The essence of the transaction between petitioner and its customer is the execution of a trade on behalf of the customer.

Accordingly, we uphold respondent's determination that petitioner must accrue commission income for the purchase or sale of securities on the trade date as opposed to the settlement date.

California Franchise Tax Issue

The next issue we must decide is whether petitioner is entitled to a deduction for its California franchise tax liability in the amount of $932,979 on its Federal income tax return for the taxable year ended December 31, 1988. Respondent does not dispute that petitioner properly deducted $879,500 on its Federal return for the taxable year ended March

_____

[7]We note, however, that the legislative history of the Tax Reform Act of 1986 indicates that for Federal income tax purposes, both cash and accrual method taxpayers must recognize gain or loss on the sale of securities traded on an established market on the date the trade is executed. S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 131. Such treatment, while not controlling as to brokerage commissions, is consistent with our holding herein.

31, 1988, for the franchise tax it paid for the California income year 1987.  Regardless of whether the franchise tax properly accrued on December 31, 1987, as petitioner contends, or on January 1, 1988, as respondent contends, both parties agree that the deduction was proper in petitioner's first Federal taxable year.  Instead, the parties' dispute centers on the deductibility of the California franchise tax for petitioner's second Federal taxable year.

To understand the crux of the dispute, it is necessary to understand some of the history with respect to the California franchise tax.  California imposes an annual franchise tax on most corporations doing business within the State of California for the privilege of exercising their corporate franchises.  Cal. Rev. & Tax. Code sec. 23151(a) (West 1992).  In general, the tax computed for the "taxable year"[8] is based upon the net income of the preceding year, which is designated the "income year".  Id. secs. 23041(a), 23042(a), 23151(a) (West 1992).

Prior to the 1972 amendments to the California franchise tax statutes, the California franchise tax generally accrued on the first day of the taxable year.  In Central Inv. Corp. v. Commissioner, 9 T.C. 128, 132-133 (1947), affd. per curiam 167 F.2d 1000 (9th Cir. 1948), we held that even though the

---

[8]The "taxable year" is the year for which the California franchise tax is payable.  Cal. Rev. & Tax. Code sec. 23041(a) (West 1992)

California franchise tax was measured by the preceding year's income, accrual basis taxpayers could accrue the tax only during the taxable year. Under pre-1972 law, withdrawal or dissolution relieved the taxpayer from taxation for the period of the taxable year during which the corporate franchise was not exercised. The tax was essentially a tax on the privilege of doing business in the taxable year. Id. at 133. All events fixing a corporation's liability for the California franchise tax did not occur until the taxable year in which it exercised its privilege. Epoch Food Serv., Inc. v. Commissioner, 72 T.C. 1051, 1053 (1979).

In 1972, California amended its franchise tax law so that withdrawal or dissolution would no longer relieve a taxpayer from tax based on the preceding year's income. In Epoch Food Serv., Inc. v. Commissioner, supra at 1054, we found that the effect of this amendment was to change the accrual date for the tax from January 1 of the taxable year to December 31 of the income year. Thus, after the 1972 amendment, the event fixing the liability for the California franchise tax is the earning of net income in the income year, rather than the exercising of the corporate franchise in the taxable year. Id.

Section 164(a) permits a deduction for State taxes during the taxable year in which paid or accrued. However, section 461(d) overrides the normal rules for accruing taxes in certain situations. Section 461(d)(1) provides:

> In the case of a taxpayer whose taxable income is computed under an accrual method of accounting, to the extent that the time for accruing taxes is earlier than it would be but for any action of any taxing jurisdiction taken after December 31, 1960, then, under regulations prescribed by the Secretary, such taxes shall be treated as accruing at the time they would have accrued but for such action by such taxing jurisdiction.

Under the regulations, any action of a taxing jurisdiction that would accelerate the time for accruing a tax is to be disregarded in determining the time for accruing such tax for purposes of the deduction allowed under section 164(a). Sec. 1.461-1(d)(1), Income Tax Regs. This applies to a taxpayer upon which the tax is imposed at the time of the taxing jurisdiction's action, as well as a taxpayer upon which the tax is imposed at any time subsequent to such action. Id.

Respondent argues that section 461(d)(1) governs and that petitioner may not accrue any deduction for California franchise taxes based on 1988 income until 1989. Petitioner, on the other hand, argues that respondent's position fails to take into account the special California statutory rules that applied to a commencing corporation's first and second income and taxable years under pre-1972 California franchise tax law. Petitioner contends those rules would have applied to petitioner's first and second taxable years so that under the pre-1972 State law, petitioner's liability would have become fixed on December 31, 1988, for the $932,979 franchise tax based on its 1988 income.

Thus, petitioner argues that the 1972 amendments did not accelerate the accrual of its California franchise tax and that section 461(d)(1) and the cases interpreting that section with respect to California law are inapplicable. See <u>Epoch Food Serv., Inc. v. Commissioner</u>, <u>supra</u>; <u>Central Inv. Corp. v. Commissioner</u>, <u>supra</u>; see also <u>Hitachi Sales Corp. of Am. v. Commissioner</u>, T.C. Memo. 1992-504.

The general rule for a taxpayer that commenced business in California before 1972 was that the franchise tax for the taxpayer's first taxable year was based upon the income received during that year and that the income for the first taxable year also served as the measure of the franchise tax for the taxpayer's second taxable year. Cal. Rev. & Tax. Code sec. 23222(a) (West 1992). Thereafter, the tax due for each taxable year was based on the income earned in the next preceding income year. <u>Id.</u> sec. 23151(a). However, a special rule applied where the commencing corporation's first taxable year was less than 12 months:

> In every case in which the first taxable year of a
> taxpayer constitutes a period of less than 12 months,
> or in which a taxpayer does business for a period of
> less than 12 months during its first taxable year, said
> taxpayer shall pay as a prepayment of the tax for its
> second taxable year a tax based on the income for the
> first taxable year computed under the law and at the
> rate applicable to the second taxable year, the same to
> be due and payable at the same times and in the same
> manner as if that amount were the entire amount of its
> tax for that year; and upon the filing of its tax
> return within 2 months and 15 days after the close of

the second taxable year it shall pay a tax for said year, at the rate applicable to that year, based upon its net income received during that year, allowing a credit for the prepayment; but in no event, except as provided in Section 23332, shall the tax for the second taxable year be less than the amount of the prepayment for that year, and said return for its second taxable year shall also be the basis for the tax of said taxpayer for its third taxable year, if the second taxable year constitutes a period of 12 months.  [Id. sec. 23222(a).]

Cal. Rev. & Tax Code sec. 23222(a) was in effect prior to December 31, 1960.[9]   Thus, prior to December 31, 1960, where a taxpayer's first taxable year was a period less than 12 months, the income from the short year was not used as the basis for computing the franchise tax for the second taxable year; rather, the income earned in the taxpayer's second taxable year was used as a measure of its franchise taxes for the second taxable year.

Petitioner argues that under the law as it existed prior to December 31, 1960 (prior to the 1972 amendment), its first year ending December 31, 1987, constituted both its first income year and its first taxable year, and that its franchise tax liability based on 1987 income would have become fixed on the last day of 1987, even if petitioner had dissolved on January 1, 1988. Similarly, petitioner argues that since its first taxable year was a period less than 12 months, its second taxable year (the

---

[9]Pursuant to the 1972 amendment, sec. 23222(a) of the Cal. Code applies only to taxpayers who commenced doing business in California prior to Jan. 1, 1972.  Cal. Rev. & Tax Code sec. 23222(b) (West 1992).

taxable year in issue) and income year would also have been the same, and, thus, the franchise tax based on its second year's income would have accrued on December 31, 1988.  We agree.

None of our prior opinions dealt with a situation where the income year and the taxable year would have been the same for purposes of the franchise tax as it applied prior to December 31, 1960.  However, that is the result of applying section 23222(a) of the California code, as it existed prior to the 1972 amendment, to the facts of this case.  Pursuant to that section, the franchise tax for petitioner's first taxable year ended December 31, 1987, would have been computed on income earned during that period and would have been payable to the State for the privilege of exercising the corporate franchise for the same period.  This franchise tax based on income received during the first year would have been due regardless of whether petitioner exercised its privilege after the close of its first year.

Because petitioner's first taxable year for franchise tax purposes was for a period of less than 12 months, prior to the 1972 amendment, Cal. Rev. & Tax Code sec. 23222(a) would have required petitioner to pay a franchise tax based on its income for the second year for the privilege of exercising the corporate franchise during the second year.  The franchise tax liability based on income earned during the second year would not have depended upon the occurrence of an event subsequent to the end of

the second year.[10]  All events necessary to fix petitioner's liability for franchise tax in the amount of $932,979 based on income earned during its second year would have occurred at the end of the second year under the law as it existed prior to December 31, 1960.  It follows that petitioner's liability to the State of California for franchise tax based on income earned during its second year, which ended December 31, 1988, would have accrued at the end of its second taxable year, regardless of the 1972 amendment to the franchise tax.  We hold that section 461(d) does not prevent petitioner from accruing its liability for franchise tax in the amount of $932,979.

Respondent argues that even if petitioner's liability for the franchise tax in the amount of $932,979, is otherwise accruable in 1988, petitioner should not be allowed the deduction because it would constitute a change in petitioner's accounting method to which respondent has not consented.  We disagree.

Petitioner used the accrual method of accounting.  It apparently did not accrue the $932,979 on its Federal income tax return because it relied on Rev. Rul. 79-410, 1979-2 C.B. 213.  That ruling relied on section 461(d) and the premise that prior

---

[10]Under Cal. Rev. & Tax Code sec. 23222(a), as it applied prior to 1972, the second taxable year would also have been the income year for purposes of computing the franchise tax for petitioner's third taxable year.  Prior to the 1972 amendment, the franchise tax for the third taxable year would not be accruable until Jan. 1, 1989, and the franchise tax for each succeeding year would have been accruable in similar fashion.

to 1972, California corporations could not generally have accrued franchise tax based on an "income year" until the first day of the following "taxable year".  While the revenue ruling is based in part on our holdings in Central Inv. Corp. v. Commissioner, 9 T.C. 128 (1947), and Epoch Food Serv., Inc. v. Commissioner, 72 T.C. 1051 (1979), those cases did not address the effect of section 23222(a) of the California code on the accruability of California franchise tax in a corporation's second taxable year where the first taxable year was less than 12 months.[11]  The impact of section 23222(a) on the case before us is a "fact" determining whether the all events test has been met. Petitioner's initial misconstruction of the facts in reliance on respondent's revenue ruling should not be viewed as a method of accounting other than the accrual method.  Applying petitioner's method of accounting to the correct facts is not a change in accounting method requiring respondent's approval.  We hold that petitioner is entitled to accrue and deduct franchise tax in the amount of $932,979 for purposes of computing its Federal income tax for the taxable year ended December 31, 1988.

Decision will be entered

under Rule 155.

---

[11]We note that the facts described in Rev. Rul. 79-410, 1979-2 C.B. 213, 213-214, address the impact of California law prior to the 1972 amendment where a corporation's first year was "other than a short year".  (Emphasis added.)