122 T.C. No. 10

UNITED STATES TAX COURT

THE CHARLES SCHWAB CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16903-98, 18095-98.          Filed March 9, 2004.

        P, for Federal tax reporting purposes, claimed a
California franchise tax deduction for 1989.
Subsequently, P claimed the 1989 deduction for an
earlier year and was successful in that claim in prior
litigation before this Court.  For purposes of these
cases, P claims entitlement to franchise tax deductions
for 1989 in the amount originally deducted for 1990.
In like manner, P claims the franchise tax deductions
originally claimed for 1993, 1992, and 1991 are now
deductible for the preceding years of 1992, 1991, and
1990, respectively.  R contends that sec. 461(d),
I.R.C., proscribes such deductions because they are
based on 1972 California legislation that provided for
the acceleration of the accrual date for said taxes.  P
contends that sec. 461(d), I.R.C., does not proscribe
its franchise tax deductions so long as California's
1972 legislation does not result in a double franchise
tax deduction for 1989 and/or later years.

P, a discount stock brokerage, purchased all of the stock of a smaller discount stock brokerage and elected to allocate the purchase price amongst the assets of the acquired brokerage.  P valued the customer accounts acquired in the stock purchase and amortized them.  R contends that P's acquired discount brokerage customer accounts are not amortizable because of differences from the customers/subscribers for which the Supreme Court permitted amortization in <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 566 (1993).  R further contends that P has overvalued the customer accounts and that, in some instances, the useful lives of the accounts may not be determinable.

<u>Held</u>:  Sec. 461(d), I.R.C., interpreted--P is not entitled to accelerate California franchise tax deductions for the years under consideration.

<u>Held</u>, <u>further</u>, P's discount brokerage customer accounts may be amortized and are not necessarily distinguishable from the subscriber accounts considered in <u>Newark Morning Ledger Co.</u>

<u>Held</u>, <u>further</u>, P has shown the value and useful life of the acquired customer accounts and is entitled to amortize them.

<u>Glenn A. Smith</u>, <u>Erin M. Collins</u>, <u>Laurence J. Bardoff</u>, and <u>Patricia J. Galvin</u>, for petitioner.

<u>Rebecca T. Hill</u>, for respondent.

GERBER, <u>Judge</u>:  Respondent, in these consolidated cases,[1] determined deficiencies in petitioner's[2] 1989, 1990, 1991, and

---

[1] These cases have been consolidated for purposes of trial, briefing, and opinion.  Docket No. 16903-98 pertains to petitioner's 1989, 1990, and 1991 tax years, and docket No. 18095-98 pertains to petitioner's 1992 tax year.

[2] The use of "petitioner" relates to the three entities that make up the consolidated group.

1992 income taxes of $2,245,332, $2,797,349, $3,101,526, and $827,683, respectively. By means of amended answers, respondent asserts increased income tax deficiencies of $2,644,782, $2,906,015, $3,210,191, and $936,349 for petitioner's tax years 1989, 1990, 1991, and 1992, respectively.[3] The issues presented for our consideration are: (1) Whether section 461(d)[4] proscribes certain California franchise tax deductions petitioner claims; (2) whether petitioner's acquired discount stock brokerage customer accounts may be amortized; (3) if the customer accounts may be amortized, whether petitioner has established their fair market value; (4) whether petitioner has shown the "useful lives" of certain customer accounts for purposes of amortization; and (5) alternatively, if petitioner is unsuccessful regarding issues (2), (3), and (4), whether

---

[3] In the amended answers, respondent asserted increased deficiencies attributable to the franchise tax issue and the amortization of intangibles. For 1989, respondent made no determination with respect to the franchise tax deduction petitioner claimed. After the notice of deficiency was issued, petitioner was successful in claiming the amount originally claimed in 1989 in its short year ended Dec. 31, 1988. Accordingly, respondent asserts an increased deficiency to account for petitioner's change in position. As to the amortization of intangibles, respondent originally determined that petitioner was entitled to some amortization. Respondent changed his position in the amended answer, denying petitioner any amortization and asserting increased deficiencies.

[4] Section references are to the Internal Revenue Code in effect for the periods under consideration. Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner is entitled to an abandonment loss equal to the value of the acquired intangibles it abandoned after the business acquisition.

## FINDINGS OF FACT[5]

Petitioner comprises three corporations that file consolidated Federal corporate income tax returns.  The group consists of the Charles Schwab Corp., a Delaware corporation, its first-tier subsidiary, Schwab Holdings, Inc., a Delaware corporation, and its second-tier operating subsidiary, Charles Schwab & Co., Inc., a California corporation.  At the time of the filing of the petitions in these consolidated cases, petitioner's principal office was in San Francisco, California.

Petitioner provides discount securities brokerage and related financial services, primarily to individuals, throughout the United States and is a member of all major U.S. securities exchanges.  During the years under consideration, the principal service petitioner provided was to execute trade orders to facilitate sales and purchases of stock and securities on behalf of customers.  Petitioner's business strategy was to serve self-directed customers who either did not require research, investment advice, or portfolio management or did not desire to

---

[5] The parties' stipulations of fact are incorporated by this reference.  Over the period from March 2000 through October 2002, the parties entered into six stipulations of fact with exhibits, all of which have been received into evidence.

pay higher commissions to cover the costs of those services.  For Federal income tax purposes, petitioner reports income and deductions under the accrual method of accounting and has adopted the "recurring item exception" under section 461(h)(3).

On February 9, 1987, petitioner qualified to do business in California and on April 1, 1987, began operations.  Petitioner used a calendar year for California franchise tax purposes. Petitioner's first tax year for Federal income tax purposes ended on March 31, 1988.  In its second and successive years, petitioner's tax year for Federal income tax purposes was changed to the calendar year.

Petitioner's California franchise tax liabilities were originally deducted on its Federal corporate income tax returns in the following manner:

| California Income Computational Tax Base | Federal Tax Year | California Franchise Tax Liability |
|---|---|---|
| 1987 calendar year | FYE 3/31/88 | $879,500 |
| 1988 calendar year | 1989 calendar year | 932,979 |
| 1989 calendar year | 1990 calendar year | 1,806,588 |
| 1990 calendar year | 1991 calendar year | 2,066,547 |
| 1991 calendar year | 1992 calendar year | 3,778,547 |
| 1992 calendar year | 1993 calendar year | 5,578,718 |

Petitioner, on its Federal corporate income tax return for the short (9-month) year ended December 31, 1988, did not claim a California franchise tax deduction.

In <u>Charles Schwab Corp. & Includable Subs. v. Commissioner</u>, 107 T.C. 282 (1996) (Schwab I), affd. on another issue 161 F.3d 1231 (9th Cir. 1998), cert. denied 528 U.S. 822 (1999), petitioner claimed that the $932,979 originally deducted on its 1989 calendar year return was deductible for its short year ended December 31, 1988. This Court held that petitioner was entitled to deduct the $932,979 for its short year ended December 31, 1988. <u>Id.</u> That holding left petitioner unable to deduct the $932,979 for its calendar year 1989, as it had on its original 1989 corporate return. For purposes of this Federal tax litigation, petitioner now claims to be entitled to deduct California franchise tax liabilities for the same taxable period for which the franchise tax was calculated; i.e., the year prior to the year for which petitioner originally deducted the California franchise tax on its Federal tax returns. The following schedule reflects the years and amounts for which petitioner originally claimed California franchise tax deductions, and the years and amounts for which petitioner claims deductions for purposes of this litigation:

| | Amounts | |
| Taxable Year | Originally Claimed | Now Claimed |
| --- | --- | --- |
| 1989 | $932,979 | $1,806,588 |
| 1990 | 1,806,588 | 2,066,547 |
| 1991 | 2,066,547 | 3,778,547 |
| 1992 | 3,778,547 | 5,578,718 |
| 1993 | 5,578,718 | N/A |

By mid-1988, petitioner's long-term plan included the strategic objective of increasing its market share by various means, including the acquisition of other discount brokerages. On March 31, 1989, petitioner purchased all of the shares of stock in Rose & Co. Investment Brokers, Inc. (Rose), from Chase Manhattan Corp. (Chase). Petitioner paid $34,122,661 cash at a time when Rose's liabilities totaled $146,279,570. In addition, petitioner's capitalized acquisition fees for the acquisition of the Rose stock were $974,638. Accordingly, petitioner's "Modified Aggregate Deemed Sales Price" (MADSP), as defined in section 1.338(h)(10)-1T(f), Temporary Income Tax Regs., 51 Fed. Reg. 745 (Jan. 8, 1986) (in effect for 1989), was $181,376,869 ($34,122,661 + $146,279,570 + $974,638 = $181,376,869). Petitioner also paid $3 million for an agreement not to compete from Chase.

Christopher V. Dodds was a key employee of petitioner who was responsible for evaluation and implementation of corporate acquisitions and investment opportunities. Mr. Dodds was individually responsible for the quantitative and qualitative evaluation that was used as the basis for petitioner's acquisition of Rose. Mr. Dodds prepared a report, "Project Colors", which he presented to petitioner's board of directors. In addition to preparing the report, Mr. Dodds was one of the two

individuals who represented petitioner's interests in the negotiations with Chase in the course of petitioner's acquisition of Rose.

Although petitioner's primary interest and goal was to purchase the Rose customer accounts, Chase was willing to sell the customer accounts only along with the rest of Rose's assets. At the time of the acquisition, petitioner was the predominant discount broker in the financial services industry with a 42.4-percent market share on the basis of total commissions for the period January through September 1988. The next largest discount broker was Fidelity with a 17.8-percent market share. Rose was the fifth largest discount broker with a 2.8-percent market share.

The Rose customers were generally equity and option traders with characteristics very similar to those of petitioner's customers. Rose used five categories to classify its customers: Cash, cash management, margin, pension, and institutional. Petitioner used only three categories of customer classification: Cash, margin, and pension. Petitioner did not generally have institutional customers. Rose's institutional customers represented a relatively small portion of Rose's customer base, in both actual numbers and the amount of revenue generated.[6]

---

[6] For purposes of these cases and because Rose's institutional customers were not significant in number, it
(continued...)

Petitioner maintained offices in all but one of the markets where Rose's customers were located.  Petitioner, to some extent, provided more services to its customers than did Rose. Corresponding to the level of services, the fees charged to Rose's customers were 8-13 percent less than those charged to petitioner's customers.  Generally, Rose's customers were more active traders than petitioner's customers.  There were some additional, but less significant, differences in the customer bases, and petitioner believed that it generally offered more to its customers than Rose offered to its customers.  Petitioner's analysis focused on the value of Rose's customer accounts and the income that could be derived from them.  On the basis of the analysis performed by Mr. Dodds and others, petitioner concluded that customers acquired from Rose would likely assimilate and be retained as customers of petitioner.

During June 1990, Deloitte & Touche (Deloitte) submitted an appraisal of the fair market values of the Rose assets to petitioner.  Petitioner used the Deloitte appraisal to allocate its MADSP to the Rose assets.  On the basis of the Deloitte

---

[6](...continued)
appears that each party has merged the Rose's institutional customers into another category.  Essentially, the parties' positions are based on three major categories of customer accounts for petitioner and four major categories for respondent.

appraisal, petitioner allocated approximately $12,587,000 to the Rose customer accounts it acquired through the stock purchase from Chase.

Deloitte's $12,587,000 value for the Rose accounts for section 338 tax basis purposes comprised the following:

| Customer Accounts | Amount |
| --- | --- |
| Cash brokerage | $4,014 |
| Margin brokerage | 6,522 |
| Pension | 2,051 |
| Total customer accounts | 12,587 |

In valuing the Rose accounts, Deloitte compared Rose's customer account categories with those of petitioner and determined, with one exception, that both companies used similar categories to differentiate their customers.  In addition to cash, margin, and pension accounts, Rose also had a category for "Institutional" customers.

Deloitte's first step was to analyze Rose's annual (12-month) income for each of the four types of accounts for the period ended March 31, 1989.  Next, the useful lives of the accounts were determined on the basis of petitioner's actual experience.  Petitioner's data was used because Rose's data was not available and it was expected that petitioner's data would be more accurate since the Rose customers were to be part of petitioner's business environment.

With respect to the cash and margin accounts, Deloitte performed an actuarial study of petitioner's comparable account activity. Deloitte developed a survival curve reflecting the rate of retirement and the age of the assets. The start and termination dates for each account in existence from 1975 to 1989 were reviewed. On the basis of that analysis, it was determined that cash and margin customer accounts had useful lives of 4 and 6 years, respectively.

Rose's total revenues from cash and margin accounts were determined to be $6,183,294 and $6,765,276, respectively. Adjustments were then made to account for petitioner's revenue growth in the form of a 12-percent increase over each 4-year period. Thereafter pretax earnings were derived by applying the pretax profit margins petitioner used in its evaluation of the Rose business entity. A 34-percent Federal tax rate was applied to derive an after-tax income stream. Then the present value of the income stream was determined by applying a 16-percent discount. Using that methodology, the fair market values of Rose's cash and margin customer accounts were determined to be $4,130,000 and $6,711,000, respectively.

Using the same methodology as used for the cash and margin accounts, Deloitte determined that the useful life of the pension customer accounts was 14.66 years (rounded to 15) with a fair market value of $2,110,000. The total fair market value of the

acquired Rose customer accounts was $12,951,000, which was adjusted to $12,587,000 as an allocation of tax basis under section 338.

Deloitte allocated the value of Rose's institutional customers, which represented a small portion of Rose's total customers (in actual numbers and revenue), between the intangible assets denominated "Chase Vendor Agreements" and "Chase Priority Marketing Access Agreement". The vendor and marketing agreements were valued at $592,000 and $690,000, respectively, and were assigned a tax basis of $575,000 and $671,000, respectively.

On April 30, 1989, Rose was merged into petitioner, and by June 30, 1989, petitioner had withdrawn Rose's trade name from use. By that same time, petitioner had closed all Rose's offices and sold Rose's furniture and fixtures. Approximately 25 of the 107 Rose employees continued their employment with petitioner, and the others either refused offers or were terminated after the acquisition. Former Rose brokers who stayed on with petitioner were required to service any retained Rose customers under petitioner's service policies. For example, it was Rose's policy to have a specific broker service a particular customer, whereas under petitioner's approach, customer representatives did not typically have specific customers.

In determining the price to offer or pay for Rose, petitioner used comparable sales and discounted cashflow

methodologies.  Ultimately, however, the focus was on the worth of Rose's revenue stream and cashflow.  In determining petitioner's operating costs to be attributed to the revenues generated by the acquired Rose accounts, petitioner used a methodology which was denominated the "five years to fully loaded" approach.  Under that approach, revenues from the newly acquired Rose accounts were not considered to bear the cost of any of petitioner's operating expenses for the period immediately following acquisition and then to increasingly bear petitioner's operating costs to a level of parity after 5 years (when the Rose accounts become "fully loaded").  At the time of the Rose acquisition, petitioner's "fully loaded" profit margin was 21 percent, which included consideration of petitioner's depreciation of fixed assets.

Mr. Dodds determined that there were both positive and negative synergies in connection with the acquisition of Rose. The positive synergy was considered the account base or revenue stream that could be coupled with petitioner's excess capacity to service customers in its brokerage business.  Petitioner expected to strengthen its market presence in its role as the largest discount broker and to increase its geographical marketplace activity in Chicago and New York.  Because petitioner had excess customer capacity, it did not have to acquire Rose's infrastructure.  Accordingly, the negative synergy consisted of

the cost of severing Rose employees and terminating leases, and closing down and liquidating unneeded Rose infrastructure. On the basis of internal judgment and experience, petitioner determined that 5 years was a suitable period for the Rose customers to be absorbed into petitioner and to bear the overhead burdens in parity with petitioner's existing accounts at the time of acquisition.

OPINION

## I.   California Franchise Tax

This issue arises in connection with the parties' disagreement concerning the application and interpretation of section 461(d) and section 1.461-1(d)(1), Income Tax Regs. Section 461(d) was enacted to proscribe the acceleration of State and local tax deductions due to State or local legislation enacted after 1960. Ultimately, this is a matter of timing and a question of for which year(s) petitioner is entitled to deduct California franchise tax.

Petitioner's position is that section 461(d) was enacted to prevent situations where taxpayers might receive two franchise tax deductions in the same taxable year. The post-1960 California legislation in question does not, in petitioner's factual circumstances, cause more than one deduction in any year under consideration. Conversely, respondent's position is that

section 461(d) is not so limited in its application and that it proscribes any acceleration of the accrual of State tax produced by post-1960 legislation.

Under respondent's interpretation, petitioner would not be entitled to a franchise tax deduction for its 1989 calendar year.[7]  Respondent contends that the fact that petitioner does not receive a 1989 franchise tax deduction is due to unique factual circumstances surrounding petitioner's 1989 reporting year.  Conversely, petitioner's interpretation of section 461(d), if correct, would result in franchise tax deductions greater than those originally claimed, including those for petitioner's 1989 tax return.

Section 164(a) generally provides for the deduction of qualified State and local taxes in the year paid or accrued.  The California franchise tax is a type of tax that would normally be deductible under section 164(a).  The application of section 164 was modified during 1960 by the enactment of section 461(d),

---

[7] Petitioner's original reporting position for 1989 was to claim a $932,979 deduction for California franchise tax and no deduction for its short taxable year ended Dec. 31, 1988.  In Charles Schwab Corp. & Includable Subs. v. Commissioner, 107 T.C. 282 (1996) (Schwab I), affd. on another issue 161 F.3d 1231 (9th Cir. 1998), cert. denied 528 U.S. 822 (1999), it was decided that petitioner was entitled to deduct the $932,979 in its short taxable year ended Dec. 31, 1988, leaving the 1989 year with no deduction for California franchise tax.  Petitioner then claimed that $1,806,588, originally deducted for 1990, should be deductible for 1989.  In turn, respondent amended the answer in response to petitioner's change from its reporting position.

which proscribes the accrual of State tax attributable to post-1960 State legislation that would accelerate the accrual of such tax. Section 461(d)(1) provides:

> In the case of a taxpayer whose taxable income is computed under an accrual method of accounting, to the extent that the time for accruing taxes is earlier than it would be but for any action of any taxing jurisdiction taken after December 31, 1960, then, under regulations prescribed by the Secretary, such taxes shall be treated as accruing at the time they would have accrued but for such action by such taxing jurisdiction.

Petitioner contends that section 461(d) was intended to prevent a taxpayer from deducting two State tax liabilities in any 1 Federal taxable year. Going a step further, petitioner contends that it is entitled to an accelerated deduction for State tax, so long as it does not become entitled to more than one California franchise tax deduction for any Federal taxable reporting year. Petitioner's position, in great part, appears to be sourced in the following legislative history that provides some of the bases for enactment of section 461(d):

> it is to be noted that the rule of law that a tax liability is accruable on a certain date such as the assessment or lien date has developed over a long period of years through court decisions and is a basic concept which the Internal Revenue Service has recognized in numerous rulings. Several States in recent years have changed this accrual date from January 1 to [the preceding] December 31 in order to provide an extra accrual date for State taxes. This amendment [adding sec. 461(d)], which would be effective for years after 1960 [the year of enactment] and thus put the States and taxpayers on proper notice, would change the law to provide for only one accrual

for State taxes in any one taxable year where the State
legislature has changed the accrual date, and would
thus eliminate the additional deduction available under
existing law. * * *

Conf. Rept. 2213, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 902,

905.

The operation of section 461(d) is illustrated by section

1.461-1(d)(3), Example (1), Income Tax Regs.  In that example,

the tax assessment (and therefore accrual) date was July 1 each

year, and in 1961 the State changed the law to move the

assessment date from July 1, 1962, to December 31, 1961.  But for

section 461(d), taxpayers, under the accrual method of

accounting, would have been entitled to accrue and deduct, for

the Federal tax year 1962, the State tax assessed on both July 1,

1962 (for the 1961 State tax year), and December 31, 1962 (for

the 1962 State tax year), because of the change in the law.

To better understand the factual context in which this

controversy arises, we must consider the events that occurred

before petitioner's 1989 tax year (the first taxable year we

consider).  The 2 years immediately preceding 1989 were the

subject of a controversy before this Court and addressed in an

Opinion.  See Charles Schwab Corp. & Includable Subs. v.

Commissioner, 107 T.C. 282 (1996).  That case involved

petitioner's first years of operation in California and its

initial experience with the California franchise tax.

Petitioner commenced business in California during 1987 and for its Federal tax year ended March 31, 1988, deducted $879,500 for California franchise tax paid on its 1987 California franchise tax income.  That deduction was based on a January 1, 1988, accrual date.  Respondent did not question that deduction.  Instead, the controversy in Schwab I concerned whether petitioner was entitled to a $932,979 franchise tax deduction for its short (9-month) Federal tax year ended December 31, 1988.[8]

In that case, respondent argued that petitioner was not entitled to the $932,979 franchise tax deduction for its short 1988 calendar year because the 1972 amendments in California law (1972 amendments) resulted in a proscribed acceleration of the accrual under section 461(d)(1).  In particular, respondent argued that the 1972 amendments, which changed the accrual date from January 1 to the preceding December 31, caused the section 461(d)(1) proscription to apply.  Under respondent's argument petitioner would not have been entitled to claim the $932,979 franchise tax deduction until its calendar year ended December

---

[8] Petitioner, for purposes of reporting Federal tax, converted from a Mar. 31 fiscal year to a Dec. 31 calendar year during 1988 so that its calendar year ended Dec. 31, 1988, was a short year consisting of 9 months.  Petitioner had not deducted the $932,979 on its Federal return for the short year ended Dec. 31, 1988.  Instead, it had deducted that amount on its 1989 Federal return.  In Schwab I, petitioner changed from its reporting position and claimed the $932,979 for the short Federal tax year ended Dec. 31, 1988, leaving the 1989 Federal year without a deduction for California franchise tax.

31, 1989. The Court in Schwab I, however, held that the accrual for petitioner's short year ended December 31, 1988, was not affected by the 1972 amendments. Charles Schwab Corp. & Includable Subs. v. Commissioner, supra at 300.

In holding that petitioner was entitled to the $932,979 franchise tax deduction for its short year ended December 31, 1988, the Court in Schwab I reasoned that the California franchise tax law, as it existed before the 1972 amendments, would have permitted petitioner to accrue the $932,979 franchise tax deduction as of December 31, 1988. Id. at 298-300. Accordingly, the Court in Schwab I did not have to decide whether section 461(d)(1) applied or whether it was triggered by California's 1972 amendments.

In these cases, we consider petitioner's entitlement to deductions of California franchise tax for 1989 and later years. As in Schwab I, respondent contends here that the 1972 amendments trigger the application of section 461(d)(1). Under respondent's position, petitioner would be limited to the accrual of franchise tax on the January 1 date as provided for in the pre-1972 California franchise tax statute.[9]

---

[9] Under respondent's interpretation, petitioner would not be entitled to deduct the 1989 franchise tax until 1990, leaving a gap in the 1989 year due to the holding in Schwab I.

Petitioner contends that it may use the December 31 accrual date resulting in a deduction for its 1989 Federal tax year because section 461(d)(1) was intended to address situations only where a post-1960 change in State franchise tax law would result in a double deduction in 1 tax year. Because petitioner was permitted to deduct the 1988 short year California franchise tax for its 1988 Federal tax year, the acceleration (caused by the 1972 amendments) of the 1989 franchise tax to petitioner's 1989 Federal tax year does not result in two deductions in any one taxable period. To understand why the 1972 amendments do not result in more than one deduction in any of petitioner's tax years, we must review California's franchise tax regime.

California's first Bank and Corporation Franchise Tax Act (promulgated in 1929) levied a tax "for the privilege of doing business in the state during a given year, which year of privilege is designated the 'taxable year.'" Central Inv. Corp. v. Commissioner, 9 T.C. 128, 131 (1947), affd. per curiam 167 F.2d 1000 (9th Cir. 1948); Filoli, Inc. v. Johnson, 51 P.2d 1093, 1094 (Cal. 1935); see also Cal. Rev. & Tax. Code sec. 23151(a) (West 1992). Under the successor to that statute, the franchise tax was payable for the "taxable year" as measured by the net income earned by a corporate taxpayer during the preceding year, which is referred to as the "income year". Cal. Rev. & Tax. Code secs. 23041(a), 23042(a) (West 1992). The only statutorily

expressed exception to this approach concerns corporations with a tax year beginning or ending during the taxable year.

Generally, and before the 1972 amendments, a corporation beginning its first full taxable year in California paid franchise tax based on the net income for the first taxable year. In the next and successive years (second year and later) the corporation's franchise tax liability was based on the income year (first or preceding year).  Cal. Rev. & Tax. Code sec. 23222 (West 1992).

When a corporation's first operational year is less than 12 months, California's franchise tax treatment is different.  The difference occurs with respect to the second operational year. For the first year the corporation is required to file a franchise tax return within 2-1/2 months from the end of the first short year.  In effect, this tax is a prepayment of the tax for the second year.  For the second year, the corporation would again file a return within 2-1/2 months from the end of the second year and pay tax based on its second year's net income. Because of the prepayment based on the first short year, the corporation is entitled to a credit against the second year's franchise tax liability.  In that type of situation, beginning in the third year, the franchise tax obligation would be based on the income year (second year or first complete year in this example) and so on.  See id. sec. 23222(a).

Before the 1972 amendment, California franchise tax for the income year generally accrued on the first day of the taxable year. Charles Schwab Corp. & Includable Subs. v. Commissioner, 107 T.C. at 297. Although the pre-1972 California franchise tax was measured by the preceding year's net income, it has been held that it did not accrue until the taxable (or next) year. Central Inv. Corp. v. Commissioner, supra at 132-133.

In Schwab I the Court explained that the 1972 amendments were enacted to cause dissolving or withdrawing corporations to be covered by the franchise tax.[10] In effect, however, the 1972 amendments changed the accrual date for all California franchise taxpayers from January 1 of the taxable year to December 31 of the income year (preceding year).

The above-described rules addressing the franchise tax liability for a corporation's first year (but less than a full year) of operation are the rules that this Court addressed in Schwab I. Because petitioner's second year[11] franchise tax was based on the second year's net income under pre-1972 California law, the assessment or accrual, in effect, occurred on December

---

[10] The problem appears to be that a corporation that was dissolved or terminated before the Jan. 1 assessment date could avoid paying the franchise tax for its final year. To remedy this problem, the assessment date was moved back to Dec. 31 of the income year (measuring year).

[11] The second year for California franchise tax purposes is petitioner's first complete year of activity in California (1988).

31, 1988.  Charles Schwab Corp. & Includable Subs. v.
Commissioner, supra at 297; Epoch Food Serv., Inc. v.
Commissioner, 72 T.C. 1051, 1053 (1979).  Accordingly, the Court
in Schwab I found that the 1988 California franchise tax was
assessed and accruable on December 31, 1988, on the basis of
California law before the 1972 amendments.  Because of that
holding, there was no need for the Court to decide whether
section 461(d) and the underlying regulations proscribed any
acceleration caused by the 1972 amendments.[12]

Petitioner argues that section 461(d) was not intended to
result in circumstances in which a taxpayer is not entitled to
deduct any State tax in a particular year.  More particularly,
petitioner contends that the sole intent for enactment of section
461(d) was to prohibit acceleration of the accrual attributable
to post-1960 State legislation that results in double deductions.
On the other hand, respondent argues that section 461(d) and the
regulations are unambiguous and a literal reading would result in
no accrual or deduction of California franchise tax in
petitioner's 1989 year because it was deducted for petitioner's
short year ended December 31, 1988, and no additional deduction

---

[12] Because of this Court's holding in Schwab I, petitioner
received two California franchise tax deductions in connection
with the 1988 calendar year:  One for its year ended Mar. 31,
1988 (computed on the basis of the 1987 California "income
year"), and one for its short year ended Dec. 31, 1988 (computed
on the basis of the 1988 California "income year").

would have been available under the pre-1972 California franchise tax regime.  Respondent also points out that pre-1972 California law, not the 1972 amendments, permitted petitioner a deduction for its 1988 short Federal tax year.  It was that chain of events that caused a gap in petitioner's annual accrual of California franchise tax.  We agree with respondent.

Section 461(d) explicitly addresses the type of legislation enacted by California in the form of the 1972 amendments to its franchise tax law.  Epoch Food Serv., Inc v. Commissioner, supra at 1054.  The effect of the 1972 amendments was to accelerate the accrual of franchise tax to an earlier tax year.  If a corporation was fully operational in California for years prior to the 1972 amendments, but for section 461(d), that corporation would have been entitled to two franchise tax accruals in the first effective year of the 1972 amendments.  Petitioner's idiosyncratic circumstances occurred because of the convergence of its 1987 short year and the December 31, 1988, accrual of its 1988 short Federal tax year.  Those unique circumstances do not support different treatment for petitioner than would be afforded to other California corporate franchise taxpayers for the taxable years following petitioner's unique initial circumstances for 1987-89.  There is nothing in section 461(d) or the underlying

legislative history that provides for such a result or otherwise suggests that a taxpayer is guaranteed a tax accrual in every taxable year.

One might be tempted to commiserate with petitioner about what appears to be an anomalous result (i.e., no franchise tax deduction is allowable for 1989). That result, however, is due to the confluence and application of the California franchise tax laws and section 461(d). From another perspective, however, petitioner could be considered fortunate to have avoided the proscription of section 461(d) with respect to its 1988 franchise tax deduction as decided in Schwab I. It was that turn of events that resulted in a break in the tax accounting pattern and caused the result that no franchise tax deduction was available for 1989.

Section 461(d) may have been intended to avoid double deductions of taxes due to post-1960 State legislation that accelerated their accrual date. The articulated mechanism used to effect that policy, however, prohibits a corporation from "accruing taxes * * * earlier than it would [have] but for any action of any taxing jurisdiction taken after December 31, 1960". That language unambiguously embraces the California franchise tax for petitioner's 1989 tax year (its second complete year) which under pre-1972 California law would not accrue until January 1, 1990, and would be based on the 1989 "income year". We find that

the language of section 461(d) contains no ambiguity or anomaly, and we therefore apply it according to its terms.  United States v. Ron Pair Enters, Inc., 489 U.S. 235, 241 (1989); Burke v. Commissioner, 105 T.C. 41, 59 (1995).  Accordingly, petitioner is not entitled to the claimed California franchise tax deduction for its 1989 tax year.

Petitioner claimed California franchise tax deductions for the years under consideration on the basis of the pre-1972 California franchise tax rules (i.e., January 1 accrual for franchise tax for the income year (year before the taxable year)).  On the basis of petitioner's argument that section 461(d) did not apply because double deductions were not being taken, petitioner sought increased franchise tax deductions from those originally claimed on its returns.  The increase results from treating December 31 as the accrual date instead of the succeeding January 1, which was the accrual date under the pre-1972 California franchise tax statute.  Because we have decided that section 461(d) proscribes a taxpayer's use of the 1972 amendments to accelerate the accrual of California franchise tax, petitioner's claim for increased franchise tax deductions must fail for all years before the Court.

II.  Rose Issue

A.  Background

Petitioner acquired the outstanding shares of the stock of Rose, a discount stock brokerage, from Chase.  An election was made to treat the acquisition as one of assets and to apply the rules under section 338 to assign the acquisition price to the acquired assets.  In the amended answer, respondent asserted that petitioner may not amortize the customer accounts it acquired in the Rose acquisition.  If the customer accounts may be amortized, we must also decide the values and useful lives of those accounts.

The purchase of all of the outstanding shares of Rose's stock from Chase took place on March 31, 1989.  Petitioner had no interest in Rose's business name or infrastructure.  Rose was financially troubled, and its liabilities were substantial in relation to the value of its fixed assets.  Rose's liabilities ($146,279,570), in a relative sense, approached the amount of its short-term assets ($165,472,000), which consisted mainly of receivables.

Petitioner, a brokerage based on the West Coast, sought to acquire Rose's customer base in order to expand petitioner's presence in the Chicago and New York markets where Rose's operations were centered.  Petitioner had existing capacity to service more customers and sought to increase its own revenues by

the acquisition of Rose's customer base.  Because Chase would not
sell Rose's customer base separate from Rose's other assets,
petitioner purchased Rose's stock and discarded the Rose name and
infrastructure to gain access to Rose's customer base.  In line
with its goals, a short time after the acquisition, petitioner
employed a small number of Rose's employees, abandoned the Rose
name, and jettisoned all infrastructure assets other than Rose's
customer accounts, which petitioner then integrated into the
Schwab customer base.

Petitioner elected, under section 338(g) and (h)(10), to
treat the transaction as a purchase of Rose's assets.  Section
338 permits one corporation to acquire the stock of another
corporation and to elect to treat the transaction as a purchase
of the acquired corporation's assets, with the benefit of a
stepped-up basis in the acquired assets.[13]  Under the regulations
in effect for 1989, the allocation of the stock purchase price to
the acquired assets involved the calculation of the MADSP, which
in this case was $181,376,869.  See sec. 1.338(h)(10)-1T(f),
Temporary Income Tax Regs., 51 Fed. Reg. 745 (Jan. 8, 1986).  The
MADSP is then allocated, in a statutorily prescribed order, to
certain defined categories of tangible assets.  The allocation to
a particular asset may not exceed the fair market value of the

---

[13] Sec. 338 was a codification of the holding in Kimbell-
Diamond Milling Co. v. Commissioner, 14 T.C. 74 (1950), affd. per
curiam 187 F.2d 718 (5th Cir. 1951).

asset. Once the allocations have been made to the various categories of tangible assets, the remainder of the MADSP, if any, is then allocated to certain intangible assets, other than goodwill. Finally, any remaining portion of the MADSP is residually allocated to goodwill, a nonamortizable intangible asset.

Just after the 1989 Rose acquisition, Deloitte prepared an appraisal of the fair market values of the Rose assets. After calculating the $181,376,869 MADSP and allocating amounts to the tangible assets, Deloitte allocated a $12,587,000 value to the Rose customer accounts petitioner acquired by purchase of Rose's stock from Chase. The $181,376,869 MADSP comprised petitioner's cash payment ($34,122,661), petitioner's assumption of Rose's liabilities ($146,279,570), and petitioner's acquisition costs ($974,638).

B. Are the Acquired Rose Discount Brokerage Customer Accounts Amortizable?

Section 167 provides for depreciation of property used in a trade or business or held for the production of income. Section 1.167(a)-3, Income Tax Regs., interprets section 167 with respect to the depreciation of intangible assets in the following manner:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * No allowance will be

permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life.  No deduction for depreciation is allowable with respect to goodwill. * * *

As we explained in Fed. Home Loan Mortgage Corp. v. Commissioner, 121 T.C. 254, 258-259 (2003):

For an intangible asset to be amortizable under section 167(a), the taxpayer must prove with reasonable accuracy that the asset is used in the trade or business or held for the production of income and has a value that wastes over an ascertainable period of time. Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993); FMR Corp. v. Commissioner, 110 T.C. 402, 430 (1998).  The taxpayer must prove that the intangible asset has a limited useful life, the duration of which can be ascertained with reasonable accuracy, and the asset has an ascertainable value separate and distinct from goodwill and going-concern value.  S. Bancorporation, Inc. v. Commissioner, 847 F.2d 131, 136-137 (4th Cir. 1988), affg. T.C. Memo. 1986-601. * * *

Respondent admits on brief that customer accounts are one type of intangible asset for which amortization may be available under section 167.  Respondent, however, focusing on the seminal holding in Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993) (Newark), argues that customer accounts of brokers differ from newspaper subscriptions in ways which would make the Newark holding inapplicable to the facts of these cases.[14]  If the acquired customer accounts are found to be amortizable, respondent argues in the alternative that petitioner

---

[14] In Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993) (Newark), the Supreme Court held that an acquired list of newspaper subscribers had a separate value and a limited useful life and was therefore amortizable.

has not shown or established the values or the useful lives of the Rose intangibles in question. Conversely, petitioner contends that it has shown the separate values and useful lives of the customer accounts and that respondent has misinterpreted the holding in Newark.

In essence, respondent's argument is that brokerage customer accounts differ to such an extent that they do not fall within the factual context of the Supreme Court's holding in Newark. Accordingly, we begin our analysis by considering the holding in Newark. That case involved the question of whether an acquired list of newspaper subscribers could be amortized. In connection with a merger, the taxpayer allocated $67.8 million of the acquisition cost to an intangible asset consisting of a list of 460,000 identified newspaper subscribers. Each of the subscribers was described as being under an agreement for regular delivery of the paper in return for payment of a periodic subscription price. The $67.8 million allocation was based on the taxpayer's estimate of future profits to be derived from the identified subscribers.

In Newark,[15] the Government's principal argument was that the intangible asset (list of paying subscribers) was indistinguishable from goodwill and hence not amortizable. The Supreme Court noted that the Government's argument was based on the premise that goodwill was not amortizable because it has "no determinate useful life of specific duration." Newark Morning Ledger Co. v. United States, supra at 564-565. The Supreme Court further noted that the Government's justification for denying the amortization of goodwill evaporates "when the taxpayer demonstrates that the asset in question wastes over an ascertainable period of time", as it did in Newark. Id. at 565.

In holding that a customer list could be established as a depreciable asset and thereby distinguished from goodwill, the Supreme Court observed that the burden of doing so might be substantial. Id. at 566-567. On the basis of the Supreme Court's observation, respondent contends that the burden of proof

---

[15] Before the holding in Newark Morning Ledger Co. v. United States, supra, the Government had generally taken the position, as a matter of law, that many intangibles were part of goodwill. In Newark, the Supreme Court identified several customer-based intangibles which had been the subject of prior controversy, including "customer lists, insurance expirations, subscriber lists, bank deposits, cleaning service accounts, drugstore prescription files, and any other identifiable asset the value of which obviously depends on the continued and voluntary patronage of customers." Id. at 557. The Supreme Court did not list brokerage accounts as one of the intangibles that had been in controversy; however, respondent has agreed that they "appear to be in the category of identifiable assets whose value depends on continued patronage of customers."

is great and will often be "too great to bear." Id. at 566. To that end, respondent argues that newspaper subscribers agree to pay a flat rate, whereas brokerage customers do not pay unless they trade, and whether they trade is not predictable. Finally, respondent argues that the commission paid by traders (brokerage customers) is not fixed but variable. Those differences, respondent argues, make petitioner's burden so great that, on this record, it could not show and has not shown entitlement to depreciation of the customer list acquired from Rose.

Petitioner counters that respondent's argument is flawed because brokerage customers are identified individuals who maintain an established business relationship with the brokerage. Petitioner also points out that newspaper subscribers do not pay in advance, are not indebted to the newspaper, and may terminate the delivery agreement by simple notification. By contrast, many brokerage customers have cash and securities on deposit with the broker, and those who purchase on margin have a debtor-creditor relationship with the broker. In addition, termination of a brokerage relationship requires both the customer and the broker to take certain specified actions prescribed by Federal and State securities commissions. Respondent also argues that revenues from brokerage customers are variable and dependent on market forces, whereas revenue from newspaper subscribers is relatively fixed. Paradoxically, respondent's expert's prediction of income

from the Rose customer accounts, based on Rose's income and petitioner's customer data, was exceptionally accurate, showing that the income was readily predictable.

Petitioner has shown that the acquired and acquiring brokerages had essentially the same discount approach to business and that Rose's customers and petitioner's customers were categorized and treated similarly. Petitioner has also shown that it was able to separate the Rose customer accounts from the Rose infrastructure and that the Rose name and operational know-how were completely abandoned. Therefore, the customer accounts have been shown to be an exploitable asset distinct from the generalized umbrella of "goodwill" that may have existed in the Rose business and name.

In the setting we consider here, the brokerage customer accounts are valued according to their potential to generate a future income stream, and petitioner has shown that they are distinct from goodwill and have a limited useful life. See, e.g., Citizens & S. Corp. v. Commissioner, 91 T.C. 463, 500 (1988). In particular, the brokerage customer accounts were the only asset of value acquired from Rose, and most of the remaining assets acquired from Rose, including the "Rose" name, were abandoned. Accordingly, and as discussed later in this Opinion, petitioner has shown that the customer accounts can be valued and that they waste "over an ascertainable period of time". Newark

Morning Ledger Co. v. United States, 507 U.S. at 566.  We agree
with petitioner that brokerage customers are not, per se,
distinguishable from newspaper subscribers in any way that would
make the circumstances we consider here distinguishable from
those in Newark.

    C.  The Value and Useful Life of the Intangibles Petitioner
       Acquired

    1.  In General

Having decided that the Rose customer accounts are
amortizable under section 167, we now turn to the question of the
values or amounts that are subject to amortization and the useful
lives of the assets.  On these points the parties have relied on
expert witnesses to provide opinion evidence based on the factual
record.  Generally, the parties' experts used similar methodology
to arrive at the values of the Rose customer accounts.  The
experts attempted to compute the net revenue stream that
petitioner could expect from the Rose customer accounts.  Both
used petitioner's data of customer performance in petitioner's
business[16] and applied the Rose revenues that were generated in
the year before the acquisition.

---

[16] Respondent argues, however, that Rose's experience would
be preferable and that petitioner's experience was used because
Rose's experience was not available.

Petitioner relies on J. Henry Knoblick of Deloitte, who had prepared the 1990 valuation analysis of goodwill petitioner relied on to make allocations of the $181,376,869 MADSP. Respondent relies upon Lee B. Shepard of Houlihan Lokey Howard & Zukin, who prepared a report 10 years later (on May 2, 2000) in anticipation of this litigation. Each report contains an opinion regarding the March 31, 1989, values of Rose's assets and the useful lives, if any, of Rose's customer accounts. Both of the expert's reports contain values with respect to the Rose customer accounts; however, respondent's expert concluded that the useful lives of pension accounts could not be determined and, accordingly, those accounts would not be amortizable. Conversely, on the basis of petitioner's experiences with each type of discount brokerage customer, Mr. Knoblick arrived at a useful life for each category of customer account acquired by petitioner.

The following chart compares the variations in the experts' opinions as to the fair market values[17] and useful lives to be

---

[17] In the comparative chart, petitioner's values are reallocated from the $181,376,869 Modified Aggregate Deemed Sales Price (MADSP) under the sec. 338 election. Petitioner's values and resulting allocations did not result in any residual amount of goodwill. On the other hand, respondent's expert's fair market values, if found to be correct, would represent the maximum amount that petitioner would be able to allocate under sec. 338. Because the values respondent reached are approximately $35 million less than the $181,376,869 MADSP, the result under respondent's approach would be $35 million in

(continued...)

assigned to the intangibles, including the customer accounts that were acquired from Rose:

| Account | Respondent's Expert's Value | Life Years | Petitioner's Expert's Value | Life Years |
|---|---|---|---|---|
| Cash | $610,000 | 5.0 | $4,014,000 | 4 |
| Cash management | 830,000 | 10.3 | [1] | [1] |
| Margin | 500,000 | 4.3 | 6,522,000 | 6 |
| Pension | 410,000 | [2] | 2,051,000 | 15 |
| Vendor agreements | 50,000 | 5.0 | 575,000 | 5 |
| Marketing agreements | 250,000 | 3.0 | 671,000 | 3 |
| Exchange seats | 750,000 | [2] | 661,000 | [2] |
| Trademark | 600,000 | [2] | [3] | [3] |
| Software | 775,000 | 5.0 | [3] | [3] |
| Total | 4,775,000 | | 14,494,000 | |

[1] Respondent's expert separated the cash accounts into cash and cash management accounts to comport with Rose's business approach. However, petitioner's expert retained petitioner's classifications, which had no separate breakout for "Cash management" accounts.

[2] Respondent's expert opined that the useful lives of these intangible assets could not be determined.

[3] Petitioner's expert did not value or assign lives to these intangibles on the premise that they had no value and, as evidenced in the record, petitioner discarded or abandoned them.

Respondent's expert valued Rose's tangible and intangible assets (other than goodwill) at $146,280,000 on March 31, 1989, whereas petitioner's expert's value was $181,837,000. Petitioner's fair market value was close to the $181,376,869 MADSP that petitioner allocated to its acquired assets, leaving no residual amount of "goodwill". Respondent's expert's value of

[17](...continued) goodwill. For purposes of comparison, this chart reflects the spread between the parties' and their experts' positions.

$146,280,000 results in a residual of approximately $35 million, which would be classified as goodwill and therefore be unamortizable.

Concerning the intangible asset valuation, a difference of approximately $10 million exists between respondent's expert's value of $4,775,000 and petitioner's expert's value of $14,494,000. A substantial portion of that difference is attributable to the experts' valuations of the customer accounts. Respondent's expert valued the aggregate of the customer accounts at $2,350,000, whereas petitioner's expert's value was $12,587,000. Accordingly, in our consideration of the value of the intangibles, our primary focus is upon the acquired customer accounts.

### 2. Valuation of Customer Accounts

Under a section 338 election, the cost of the Rose shares allocated to an individual asset may not exceed the fair market value of the asset. Respondent contends that petitioner's expert did not use the standard for fair market value set forth in section 1.170A-1(c)(2), Income Tax Regs., and section 20.2031-1(b), Estate Tax Regs., to wit: The price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of relevant facts.[18]  That standard assumes a hypothetical buyer and seller so as to employ an objective standard that would avoid "the uncertainties that would otherwise be inherent if valuation methods attempted to account for the [idiosyncracies of the particular seller or buyer]".  Propstra v. United States, 680 F.2d 1248, 1252 (9th Cir. 1982).

Respondent contends that petitioner's approach to value is not objective and does not take into account the hypothetical buyer and seller standard set forth in the regulations. Continuing in that vein, respondent contends that petitioner's expert failed to take into account the intangibles, such as goodwill, and merely focused on the potential for an income stream from Rose's customer accounts.

Respondent's wooden reliance on the definition[19] of fair market value in section 1.170A-1(c)(2), Income Tax Regs., and section 20.2031-1(b), Estate Tax Regs., misses the point. Respondent ignores the fact that there was an actual purchase of Rose by a willing buyer who was not under any compulsion to buy--

---

[18] We note that respondent made the same argument with respect to petitioner's use of its own experience with respect to the useful lives of the acquired Rose accounts.  Our comment with respect to the issue of value apply equally to both arguments.

[19] Sec. 338 contains no reference to that definition and provides no definition for purposes of the allocation of stock purchase price to acquired assets.  In addition, sec. 338 permits taxpayers to allocate a portion of the acquisition cost to each asset in an amount that does not exceed the fair market value of the asset.

petitioner. That buyer (petitioner) determined the amount it was willing to pay for Rose on the basis of the realities and pressure of the marketplace and its objective analysis of the value residing in the assets or operations of Rose. As the record reflects, petitioner was one of only a few potential or possible buyers who would be able to use Rose's principal asset of value--its customers. Under the circumstances of these cases, Rose's customer base was the essence of its total value. The rest of its assets, including the intangibles, were without value. After the acquisition of Rose, petitioner did not attempt to sell the "Rose" name or know-how. Petitioner abandoned those assets and aspects of the Rose business simply because they had no value to petitioner or anyone else.

Respondent would have us carry the hypothetical standard to an academic level where the realities of the marketplace are ignored. A "hypothetical sale should not be constructed in a vacuum isolated from the actual facts". Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982); see also Estate of True v. Commissioner, T.C. Memo. 2001-167; Luce v. United States, 4 Cl. Ct. 212, 220-221 (1983). In Caracci v. Commissioner, 118 T.C. 379, 392 (2002), we held:

> A hypothetical buyer may be one of a class of buyers
> who is positioned to use the purchased assets more
> profitably than other entities. Accordingly, we have
> held that fair market value takes into account special
> uses that are realistically available because of a

property's adaptability to a particular business. Stanley Works v. Commissioner, supra at 400 [87 T.C. 389 (1986)]. Acknowledging the existence of such businesses in the universe of hypothetical buyers also is consistent with the standard that assets are not valued in a vacuum but, instead, are valued at their highest and best use.

Respondent would have us ignore the arm's-length sale between petitioner and Chase and instead attempt to estimate some price of each individual asset, assuming it had value or that there was a buyer willing to pay more than petitioner. Petitioner's evaluation of Rose's assets was conducted in the context of an actual transaction where the constraints of the marketplace were brought to bear on petitioner's approach to value.[20] In that regard, petitioner's valuation was also contemporaneously conducted under actual business conditions, and we accept it at face. In this situation, there is no need to conjure up a hypothetical buyer who is ignorant of the facts or to attempt to place a value on goodwill where it did not exist.

To better understand the differences in value proposed by the parties, we consider their experts' reports and approaches. In reaching our holdings on fair market value, we consider the expert witnesses' reports. It is within this Court's discretion

---

[20] Respondent's expert concluded that $35 million of the $181,376,869 MADSP represented goodwill. The facts reflect that the Rose business was a service business which did not rely on capital, and its customers were the heart of its value. The Rose entity was financially troubled and did not have the intrinsic goodwill of a going concern.

to evaluate the cogency of their conclusions and opinions. Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), affg. on this point and revg. on another ground T.C. Memo. 1986-318. This Court evaluates opinions of experts in light of each expert's demonstrated qualifications and the evidence in the record.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998) (and cases cited threat).  Accordingly, this Court may accept or reject all or parts of an expert's opinion.  Id.

First, we consider petitioner's expert's (Mr. Knoblick's) approach to valuing the customer accounts acquired from Rose.  He began by comparing Rose's designated categories of customer accounts with those petitioner used and determined, with one exception, that both companies used similar categories to characterize their customers.  Mr. Knoblick next analyzed Rose's annual (12-month) income for each of its categories of customer accounts for the period ended March 31, 1989.

Mr. Knoblick then determined the useful lives of the acquired accounts on the basis of petitioner's experiences with similar discount brokerage customer accounts.  He used petitioner's data because Rose's data was not available and, more significantly, because petitioner's data would be a more accurate

measure of useful life since the Rose customers were to be integrated into petitioner's business environment.[21]

Mr. Knoblick then focused on Rose's annual revenues from cash and margin accounts, which were determined to be $6,183,294 and $6,765,276, respectively. Those amounts were adjusted to account for petitioner's revenue growth by employing a 12-percent increase over each 4-year period. This 12-percent adjustment was based on petitioner's actual financial performance. Thereafter, pretax earnings were determined by applying the pretax profit margins petitioner used in its evaluation of the Rose business entity at the time of purchase. The use of petitioner's pretax profit margins accounted for capital burden, including the fixed and overhead costs of servicing the acquired Rose accounts. Applying a 34-percent Federal tax rate, Mr. Knoblick derived an after-tax income stream. He then applied a 16-percent discount in order to determine the present value of the income stream. Mr. Knoblick's use of the 16-percent discount was based on its use by petitioner's acquisition team in their pre-purchase analysis of Rose. Using that methodology, the fair market values of Rose's cash and margin customer accounts were determined to be $4,130,000 and $6,711,000, respectively.

---

[21] Petitioner followed the procedures for useful life set forth in sec. 1.167(a)-1(b), Income Tax Regs., as more fully discussed later in this Opinion in the section addressing useful life.

Respondent's expert (Mr. Shepard) valued cash and margin customer accounts using a different approach from Mr. Knoblick's. As previously noted, Mr. Shepard divided the valuation of the cash and margin accounts into three categories to comport with classification that had been used by Rose, whereas Mr. Knoblick used two categories to comport with petitioner's classification. Mr. Shepard valued the cash accounts at $610,000, with a 5-year useful life; margin accounts at $500,000, with a 4.3-year useful life; and cash management accounts at $830,000, with a 10.3-year useful life.

The most significant difference between the approaches of Messrs. Shepard and Knoblick is to be found in their perspective. Mr. Knoblick valued the Rose accounts on the basis of empirical information derived from petitioner's account experience. Mr. Knoblick reached the conclusion that the customer accounts were the only assets that were of value to a buyer. Mr. Shepard, however, used a more theoretical approach by valuing Rose as a going concern under traditional methods of valuing Rose's business income and cash-generating capacity. He used that approach even though his report contains information about Rose's poor performance and weak financial condition. Mr. Shepard, in his valuation, focused on the volatile nature of the equities market and a low point in the market during October 1987. Mr. Shepard's use of those factors resulted in an unnecessarily lower

value for the customer accounts and operating assets. Because of the approach required under section 338, where cost is first allocated to depreciable assets and then to nonamortizable (goodwill) intangibles, Mr. Shepard's approach is inherently unfavorable to petitioner because it results in a larger residual in the category of goodwill.

In spite of Rose's unprofitability and financial difficulties, Mr. Shepard's approach focuses on Rose as a going concern, including an evaluation of the goodwill connected with the Rose name and know-how. We cannot accept Mr. Shepard's approach under the circumstances reflected in the record of these cases. The facts in these cases reflect that a willing buyer would be interested in Rose's customers and not be interested in Rose as a going concern. It is also unlikely that Rose, a service business, would have had value in the form of goodwill, because Rose's assets, other than the large number of customer accounts, were not unique or capable of generating income, and the universe of theoretical willing buyers was limited to another discount brokerage with the capacity to use a large volume of active customers. Such a "willing buyer" would be interested in the potential for income from the exploitation of Rose's discount brokerage customers and have little or no interest in the use of the Rose name.

The universe of theoretically potential buyers was limited. Although Rose was the smallest of the top five discount brokerage firms, its business represented a 2.8-percent market share of discount brokerage customers. Petitioner, on the other hand, was the largest of the discount brokerages, and its nearest competitor, Fidelity, had a 17.8-percent market share. Because of the relatively large number of customers serviced by Rose, it is unlikely that any discount brokerage other than the top few would have the operating capacity or ability to absorb and effectively and profitably use such a large customer base. It was the potential for customer capacity and the potential synergy of customer absorption that made the large discount brokerages the willing buyers and produces the benchmark for the fair market value of Rose's customer accounts. Respondent would have us ignore this established fact and value the accounts in a manner that would give value to assets that were of no import to potential purchasers.

Rose's customers represented its only income-generating asset. Rose's infrastructure and name would be of no consequence or interest to potential buyers, who, of necessity, had to be larger entities with successful operations and name recognition. Under these circumstances, respondent's expert's going-concern approach to value is incongruous and unhelpful.

On the other hand, the approach petitioner's expert used in his report is more apropos of the circumstances we consider and was contemporaneously used by petitioner in connection with its evaluation and acquisition of Rose and reporting of the transaction. In addition, Mr. Knoblick's methodology was based on brokerage industry experience. Under those circumstances, we find Mr. Knoblick's report to be more appropriate and reliable. We were also influenced by the fact that Mr. Knoblick's approach and report do not appear to inflate or reach merely to favor petitioner's position. Conversely, Mr. Shepard's approach appears to ignore the realities we consider and inappropriately attempts to focus on a going-concern value to establish value for assets which petitioner (as well as any other "willing buyer" would have) abandoned.

Frequently, valuation cases engender intermediate results where the opinion of each party's expert is brought to bear. This instance, however, is one where full faith and credit should be given to the expertise proffered by one of the parties. We accept Mr. Knoblick's report and hold for petitioner on the question of value. In a like manner, the reliability of the results reached by Messrs. Shepard and Knoblick is repeated with respect to the valuing of the remaining customer accounts and assets.

### 3.  Useful Lives of Customer Accounts

Respondent uses a two-pronged approach in his argument that petitioner has not shown the useful lives of the Rose customer accounts.  First, respondent argues that petitioner is limited to using Rose's historical data to determine the useful lives of the acquired accounts.  If the Court decides that petitioner is entitled to use its own historical data, respondent argues that petitioner has misapplied its data to Rose's accounts.

It is not surprising that the use of petitioner's historical account life data resulted in the parties' experts reaching generally similar useful lives for the Rose customer accounts in similar categories.  So, for example, with respect to cash and margin accounts, respondent's expert concluded that the useful lives were 5 and 4.3 years, respectively, whereas petitioner's expert concluded that the useful lives for the same categories were 4 and 6 years, respectively.  Likewise, with respect to the vendor and marketing agreements, the parties' experts both concluded that the useful lives were 5 and 3 years, respectively.

The similarities result from the fact that both parties' experts used petitioner's account life experience in their analysis because there was a paucity of information available from Rose regarding the acquired accounts.  The major difference between the experts' approaches as to useful life is attributable to their categorization of the accounts.  Although both experts

used petitioner's useful lives experience, they used different categories within which to analyze the useful lives of the accounts.  Respondent's expert sought to replicate Rose's categories for its accounts, whereas petitioner's expert used petitioner's categorization.

That difference resulted in respondent's expert's carving out one more category than petitioner's expert had. Respondent's expert used a 10.3-year life in a category that did not exist in petitioner's business practice or nomenclature.  In addition to those differing approaches, the parties disagree about the interpretation and application of a regulation providing for approaches to be used in determining the useful lives of acquired assets.

In particular, section 1.167(a)-1(b), Income Tax Regs., requires the use of a taxpayer's experience with respect to the useful lives of similar property in order to determine the useful life of an acquired asset.[22]  In these cases, petitioner and

---

[22] Sec. 1.167(a)-1(b), Income Tax Regs., in pertinent part, provides the following standards and approach for determining the useful life of "similar" assets:

> For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income.  This period shall be determined by reference to his experience with similar property

(continued...)

respondent both used petitioner's useful life experience to determine the useful life of the customer accounts acquired from Rose.[23] The parties disagree about the degree of similarity necessary before a taxpayer can use its own experience to determine the useful life of an acquired asset.

Respondent contends that petitioner is not entitled to use its own experience because it has not shown that the acquired Rose accounts are similar to petitioner's accounts. To that end, respondent argues that historical information was not available on the Rose accounts and that the information that was available reflected that Rose's active accounts had declined and were older than petitioner's and that there were categorical differences between them.[24]

Petitioner contends that Mr. Dodds's testimony regarding the similarity of petitioner's and Rose's accounts was sufficient to

---

[22](...continued)
taking into account present conditions and probable future developments. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

[23] Respondent argues that Rose's experience should have been used, but that respondent's expert was forced to use petitioner's data because insufficient Rose data was available.

[24] Respondent's argument that the Rose customers varied substantially from petitioner's customers is, to a great extent, paradoxical. Respondent acknowledges that there is insufficient Rose data. Notwithstanding that acknowledgment, respondent saw fit to argue that the Rose accounts are dissimilar from petitioner's accounts.

meet the spirit and letter of the subject regulation.  Mr.
Dodds's uncontradicted testimony reflected that there were some
differences in the categorization of accounts[25] and in the
individual trading volume or activity of customers, but that the
clientele of both firms was substantially similar.  Both were
discount brokerages, and they competed in the same market for
their clientele.

Petitioner also notes that respondent's expert's report,
using petitioner's preacquisition revenue experience, resulted in
predictions of the postacquisition revenue stream from Rose
accounts with better than 80-percent accuracy in early years and
98-percent accuracy for the third and fourth years after
acquisition.  Further, petitioner highlights the fact that it was
the leader in the discount broker industry with a 42.4-percent
market share.  That fact made petitioner's experience, within the
meaning of the regulation, sufficiently "adequate" to determine
the useful lives that the Rose accounts were likely to have in
the context of petitioner's business.

Ultimately, the disagreement between the parties boils down
to the degree of similarity needed to invoke the use of one's own

---

[25] Specifically, Rose had more institutional customers.
Respondent also argues that petitioner's expert (Mr. Knoblick)
used shorter lives in his analysis than were estimated by Mr.
Dodds in connection with the preacquisition analysis of Rose.  We
pay little heed to respondent's point because Mr. Knoblick's
analysis was based on an actuarial approach, comprising a
complete historical analysis of all of petitioner's accounts.

experience regarding useful life.  Respondent contends that a high degree of similarity is required, whereas petitioner's approach implies that a reasonable amount of similarity is sufficient.  The regulation merely uses the term "similar property" without describing any particular degree of similarity.

As a practical matter, petitioner's experience with discount brokerage customer accounts is vast.  The record we consider, including Mr. Dodds's testimony, does not differentiate, in any meaningful way, among the accounts or customers of the various brokers within the universe of discount brokerages.  On that basis alone, we believe that it would be prudent to hold that the Rose accounts were sufficiently similar to permit petitioner to invoke the use of its useful life experience under section 1.167(a)-1(b), Income Tax Regs.[26]

Petitioner also references a case where this Court held that comparable assets were sufficient to meet the "similar" requirement.  In Colo. Natl. Bankshares, Inc. v. Commissioner, T.C. Memo. 1990-495, affd. 984 F.2d 383 (10th Cir. 1993), the Court recognized that NOW bank accounts were relatively new with little data available on their useful life.  Recognizing that

---

[26] Petitioner also notes that the regulation provides that in situations where a taxpayer's experience is not adequate, industry experience is to be used.  In that regard, petitioner states that no such industry study exists but rationalizes that petitioner's experience would dominate any industry study because of its 42.4-percent market share.

fact, this Court held that checking and savings accounts were similar to NOW accounts for purposes of section 1.167(a)-1(b), Income Tax Regs. We have little difficulty using the same reasoning here; i.e., discount brokerage customers are generically similar enough for purposes of the regulation to allow petitioner to use its own data to determine the useful lives of the acquired customer accounts.

Respondent also relies on the Colo. Natl. Bankshares case with respect to the method used to analyze the useful life of acquired bank deposits. Respondent points out that the Court relied on the historical data on deposits where it was available. Where the data was missing, however, the life of the acquired deposits was estimated on the basis of the historical data of other banks. The object lesson of that rationale, however, is that historical data of the acquired asset is not essential to determining similarity. Indeed, the regulation itself permits industry experience as a substitute.

Respondent also argues that Colo. Natl. Bankshares shows that deposits at different banks "behaved" differently and, on the basis of that fact, respondent contends we should expect that Rose's discount brokerage accounts would not necessarily be similar to those of petitioner. We cannot rely on such analogies

without some factual predicate in this record. The record we consider, especially Mr. Dodds's testimony, supports a contrary factual finding.

Central to the structure and approach of section 1.167(a)-1(b), Income Tax Regs., is the use of the acquiring taxpayer's experience to determine useful life because the acquired asset will probably perform like similar property in the context of the acquirer's business. Setting the similarity standard at an extremely high level, as contended for by respondent, could undermine the intended purpose of the regulation. There is little question that petitioner's customer accounts were sufficiently similar to the acquired accounts to permit petitioner to use section 1.167(a)-1(b), Income Tax Regs., in determining the useful lives of the acquired accounts. We sustain the useful lives petitioner derived.

Considering the parties' experts' approaches, we conclude and hold that petitioner has shown sufficient similarity to use its own useful life data and categorization to determine the useful lives of the acquired Rose accounts. In addition, we hold that petitioner's approach in deriving the useful lives of the acquired Rose accounts is reasonable and appropriately reflects the useful lives for purposes of amortization.

Reiterating, for the acquired cash and margin accounts, Mr. Knoblick performed an actuarial study of petitioner's comparable

account activity.  He developed a survival curve reflecting the rate of retirement and the age of the assets.  The starting and ending dates for all accounts in existence from 1975 to 1989 were reviewed.  On the basis of that analysis he determined that cash and margin customer accounts had useful lives of 4 and 6 years, respectively.

Mr. Knoblick used that same methodology to determine the useful life of the pension customer accounts to be 14.66 years (rounded to 15).  For the same reasons as stated for cash and margin accounts, we accept petitioner's use of 15 years for the pension customer accounts.  We also note that we likewise accept and hold that the fair market value of the pension accounts was $2,110,000.

The value of Rose's institutional customer accounts, which represented a small portion of Rose's customer accounts in actual numbers and revenue, was allocated between the intangible assets denominated "Chase Vendor Agreements" and "Chase Priority Marketing Access Agreement".  The vendor and marketing agreements were valued, as intangibles, at $592,000 and $690,000, respectively, and were assigned tax bases of $575,000 and $671,000, respectively.  We also find for petitioner on those valuations and useful lives.[27]

---

[27] We note that our findings and holdings in these cases result in a total fair market value for the acquired Rose

(continued...)

In summary, we sustain the values and useful lives petitioner advocates.[28]

To account for concessions of the parties and to reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[27](...continued)
customer accounts of $12,951,000, which was adjusted to $12,587,000 for purposes of allocating petitioner's acquisition cost to the tax bases of the assets under petitioner's sec. 338 election.

[28] Because we have sustained petitioner's position with respect to the values and useful lives of the acquired intangible assets, it is unnecessary to consider petitioner's argument that it is entitled to an abandonment loss with respect to the assets it disregarded in connection with the acquisition of Rose.