**SOUTHERN FAMILY INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Case No. 8:05–cv–2158–T–30MAP.**

United States District Court, M.D. Florida.

July 8, 2010.

Jody Elizabeth Collins, Florida Department of Financial Services, Miami, FL, Richard A. Alayon, Alayon & Associates, PA, Coral Gables, FL, Michael L. Chapman, Noel R. Boeke, Brandon Paul Faulkner, Holland & Knight, LLP, Tampa, FL, for Plaintiff.

Michael N. Wilcove, Mara Anne Strier, Patrick J. Hannon, U.S. Department of Justice, Washington, DC, for Defendant.

### ORDER

JAMES S. MOODY, JR., District Judge.

THIS CAUSE comes before the Court upon Defendant's Motion for Partial Summary Judgment and Supporting Memorandum (Dkt. 246), Poe Financial Group, Inc.'s Response to Defendant's Motion for Partial Summary Judgment (Dkt. 263), and Southern Family Insurance Company's Response to Defendant's Motion for Partial Summary Judgment (Dkt. 262). The Court, having reviewed the motion, responses, record evidence, and being otherwise advised in the premises, concludes that Defendant's Motion should be denied.

### BACKGROUND

#### I. Introduction

Following the aftermath of Hurricane Andrew in 1992, a number of property and casualty insurers ceased writing and/or renewing windstorm insurance policies in Florida. As a result, the State of Florida (the "State") and its residents faced an insurance crisis. In response to the crisis, the State passed legislation creating the Residential Property and Casualty Joint Underwriting Association (the "JUA") as a windstorm insurer of last resort. Following its creation, the JUA[1] issued over one million residential insurance policies. In order to encourage private insurers to re-enter the marketplace, the State passed further legislation, codified at section 627.3511, Florida Statutes, to encourage the transfer of property insurance policies from the JUA to private insurers.

Pursuant to the legislation, the State provided what it referred to as "take-out bonuses" to private insurers for each risk they removed from the JUA. *See Fla. Stat.* § 627.3511. The bonuses were not, however, immediately transferred to the private insurers. Instead, the payments were paid into an escrow account (the "Escrow Account") pursuant to the terms of the statute and an escrow agreement among the State, the JUA, and a third-party trustee. Under this arrangement, the trustee was allowed to release the bonuses to the

---

**1.** The JUA was the predecessor to Citizen's Property Insurance Corporation ("CPIC").

private insurers only after certain terms were met.

Generally, insurers were required to provide coverage under a policy for three years before the corresponding funds were released. Upon expiration of that three-year period, the JUA would conduct an audit to determine whether the insurer had provided coverage under the applicable policies and otherwise complied with the statute. Following the audit of a private insurer, the bonuses, together with accrued interest, were released to the insurer. If the insurer was not entitled to receive any portion of the funds, that portion would be returned to the JUA.

Plaintiff Southern Family Insurance Company ("Southern Family") was formed in 1996 to write residential insurance policies and participate in the JUA policy takeout program. Southern Family ultimately took over thousands of policies from the JUA. As a result, the JUA deposited takeout bonuses into the Escrow Account. The takeout bonuses relevant to the instant action were deposited by the JUA into the Escrow Account during the calendar years 1996–1999.

In 1999, the JUA approved the first release of funds to Southern Family. These funds related to the policies "taken out" by Southern Family during the 1996 taxable year. Southern Family accounted for these takeout bonuses as a direct contribution to capital and surplus and did not report the same as taxable premium income on its 1999 federal income tax return.

For the tax years 1996–1998, Southern Family did not file a stand-alone tax return. Instead, Plaintiff Poe Financial Group, Inc. ("Poe Financial"), the common parent of a group of corporations that included Southern Family, filed a consolidated return. For the 1999 tax year, Southern Family was not a member of the consolidated group and filed a separate stand-alone return.

Following examination of the consolidated tax returns for 1996–1998, together with Southern Family's 1999 return, the Internal Revenue Service ("IRS") issued notices of deficiency to Poe Financial for 1996–1998 and Southern Family for 1999. The IRS determined that Poe Financial and Southern Family had improperly treated the takeout bonus payments as capital contributions and therefore had erroneously excluded the payments from gross income. Southern Family paid the amount of the deficiency for the relevant tax years (1996–1999). Seeking return of the taxes paid to satisfy the deficiency, Poe Financial filed an administrative refund claim for tax years 1996–1998, and Southern Family filed a separate administrative refund claim for 1999. The IRS denied both administrative refund claims. The IRS determined that the takeout bonuses were included in income in the years in which Southern Family removed the policies from the JUA, not when the amounts were distributed from escrow, and that the escrow earnings were included in the year in which they were credited to the escrow account.

Subsequently, Poe Financial and Southern Family filed separate actions against the United States for refund of the same taxes paid on the bonus payments, plus accrued interest, for the years 1996–1998. Southern Family also filed a separate refund action against the United States in connection with taxes paid on the bonus payments for 1999. These separate actions were consolidated into the instant action on November 7, 2007.[2]

---

**2.** Prior to filing of the now consolidated lawsuits, Poe Financial filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in *In re Poe Financial Group, Inc.*, Case No. 8:06–bk–04288–CPM, and Southern Family was placed into receivership by the State of Florida, Department of Financial Services.

On April 1, 2009, the United States moved for partial summary judgment with respect to Plaintiffs' claim that the takeout bonuses were capital contributions, and thus excludable from gross income (Dkt. 157). On May 6, 2010,[3] the Court held a hearing on this motion and, after hearing argument from counsel, denied the motion, concluding that material issues of fact precluded an entry of judgment on the issue of whether the takeout bonuses were capital contributions (Dkt. 247).

On April 30, 2010, the United States moved again for partial summary judgment (Dkt. 246). That motion, which is currently at issue, addresses Plaintiffs' alternative argument, i.e., that the takeout bonuses and interest did not accrue as income until they were released from escrow. The United States argues that, as a matter of law, the takeout bonuses accrued as income when they were escrowed and interest accrued as it was earned.

For the reasons set forth herein, the Court concludes that the United States' motion on this issue should be denied. As a matter of law, the takeout bonuses and interest did not accrue as income until they were released from escrow. Thus, in addition to denying the United States' motion, the Court orders the United States to file a response with the Court within fourteen (14) days from the date of this Order as to why the Court should not enter, *sua sponte,* partial summary judgment in favor of Plaintiffs on this issue.

## II. Undisputed Facts Relevant to the Timing Issue

Southern Family participated in the takeout bonus programs pursuant to a Policy Takeout Agreement, Portfolio Assumption Agreements, and amendments to those agreements. Southern Family and the JUA entered into a Policy Takeout Agreement ("PTA") on July 17, 1996. Subsequently, Southern Family and the JUA entered into a related Portfolio Assumption Agreement ("PAA"), as well as numerous amendments and addenda which provided for the assumption of additional policies. On May 1, 1998, Southern Family and the JUA entered into the Market Challenge Portfolio Assumption Agreement ("MCA"). On July 30, 1998, Southern Family and the JUA entered into the 1998 Coastal Countdown Portfolio Assumption Agreement ("CCA").

The terms and conditions of the agreements governing Southern Family's participation in the JUA's takeout bonus programs were substantially similar to those in Section 627.3511. Southern Family applied to participate in a program by submitting a proposed takeout plan. The Florida Legislature provided that the takeout bonuses could be paid in amounts up to $100 each. Southern Family would forfeit all of the takeout bonuses and earnings if it failed to remove at least 25,000 policies from the JUA. If Southern Family failed for a period of thirty days to maintain coverage for at least 25,000 policies, Southern Family would forfeit all of the takeout bonuses and earnings under the PTA. The CCA required Southern Family to remove 5,000 policies as a condition of receiving any takeout bonuses under that program. The JUA did not guarantee that Southern Family would be able to secure a sufficient number of policies to qualify for the payment of takeout bonuses.

The JUA deposited takeout bonuses into a third-party escrow account pursuant to an Escrow Agreement between the JUA

---

*See State of Florida, ex rel., The Department of Financial Services of the State of Florida v. Southern Family Insurance Company,* Case No.2006–CA–1060 (Fla.2d Jud. Cir.).

**3.** The case was substantially stayed from April 20, 2009 until approximately March 30, 2010, due to the parties' settlement negotiations, which ultimately reached an impasse.

and Southern Family. Under the Escrow Agreement, the escrow agent could disburse funds only pursuant to written directions from the JUA. The escrow agent could release funds for the payment of claims to insureds upon the receipt of joint written direction from the JUA and Southern Family. Southern Family could direct the escrow agent to invest the escrowed funds in obligations of specific categories of investments, which were enumerated in the Escrow Agreement. If Southern Family failed to provide direction, the escrow agent was required to invest the funds in the same categories of investments. All investments were to be made in the name of the escrow agent.

At the end of the escrow period, Southern Family was entitled to a takeout bonus if it had provided coverage under the removed policy for the three-year escrow period. During this three-year period, Southern Family could not cancel or elect not to renew any of the policies for the purpose of reducing its risk of hurricane losses. Southern Family was permitted to cancel or not renew up to three percent of the total number of the policies for other lawful reasons as long as it accepted a similar replacement policy from the JUA. Southern Family could not access the takeout bonuses while they were in escrow. Further, section 627.3511(5)(a) provided that the takeout bonuses remained the property of the JUA during the escrow period.

At the end of each escrow period, Southern Family was subject to an audit and a recalculation of the takeout bonus amounts to which it was entitled. A second review and recalculation was conducted by the JUA prior to the release of any escrow earnings to Southern Family at the end of the last escrow period for a program. The JUA retained the right to further adjust the amount of earnings released to South-

ern Family based on this second review and recalculation.

If the audit revealed that Southern Family canceled or elected not to renew a policy to reduce its risk of hurricane loss, the takeout bonus related to that policy, along with any income earned on that bonus, remained the property of the JUA. If Southern Family canceled or elected not to renew more than three percent of the policies for other reasons, or did not accept a replacement policy from the JUA, the escrowed takeout bonuses related to those policies remained the property of the JUA. Southern Family was entitled to receive any earnings on the escrowed funds upon the release of the last takeout bonus associated with a particular program.

During 1996–1999, the JUA deposited into escrow the following takeout bonuses for policies transferred to Southern Family: $7,125,000 for 1996; $4,754,281 for 1997; $2,430,458 for 1998; and $832,100 for 1999. During the escrow periods, many policies were cancelled or not renewed. As a result, at the end of the escrow periods, the escrow agent released to Southern Family: $6,876,500 for 1996; $4,859,913 for 1997; $2,392,590 for 1998; and $394,050 for 1999.

## DISCUSSION

### I. Summary Judgment Standard

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly sup-

ported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir.1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989).

## II. Tax Law on the Issue of Timing

■ Accrual basis taxpayers, like Southern Family, are not taxed on income until all events have occurred which fix the right to receive such income and the amount can be determined with reasonable accuracy. *See* 26 C.F.R. § 1.451–1(a); *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184–85, 54 S.Ct. 644, 78 L.Ed. 1200 (1934); *Commissioner v. Hansen*, 360 U.S. 446, 464, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). Under the all events test, it is the fixed right to receive the income that is controlling and not whether there has been actual receipt. *Spring City Foundry Co.*, 292 U.S. at 184–85, 54 S.Ct. 644. The taxpayer's right to receive income is fixed upon the earliest of (1) the taxpayer's receipt of payment, (2) the contractual due date, or (3) the taxpayer's performance. *Schlude v. Commissioner*, 372 U.S. 128, 133, 137, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963); *Cox v. Commissioner*, 43 T.C. 448, 456–57 (1965). An accrual basis taxpayer must report income in the year the right to such income accrues. *Charles Schwab Corp. v. C.I.R.*, 107 T.C. 282 (Tax Ct.1996).

If the taxpayer has not actually received payment, courts will consider whether conditions precedent to the taxpayer's receipt of the income exist. *Id.* "[I]f, in the case of compensation for services, no determination can be made as to the right to such compensation or the amount thereof until the services are completed, the amount of compensation is ordinarily income for the taxable year *in which the determination can be made.*" 26 C.F.R. § 1.451–1(a) (emphasis added).

■ Here, Plaintiffs argue that the facts are clear that Southern Family's right to receive the takeout bonuses was not fixed at the time they were deposited into escrow. Plaintiffs point to a number of cases in which the courts held that where a

portion of a payment for services is deposited into an escrow or retainage account, and the release of the payment is conditioned upon the taxpayer's satisfactory completion of its performance under the contract, the taxpayer has no fixed right to receive the payment at the time the payment is deposited into escrow. *See, e.g., United States v. Harmon,* 205 F.2d 919 (10th Cir.1953); *Bizzack Bro. Constr. Corp. v. C.I.R.,* 1980 WL 4286 (Tax Ct.1980); *Gar Wood Indus., Inc. v. United States,* 437 F.2d 558 (6th Cir.1971).

In *Harmon,* there was a contract between the taxpayer, who used the accrual method of accounting, and a public housing authority for the construction of housing projects. 205 F.2d at 920. The contract provided that the housing authority would retain 30 percent of the fixed fee due to the taxpayer. *Id.* The contract also provided that the retained amount would be released to the taxpayer upon the final acceptance of the work performed. *Id.* The actual amount to be surrendered was subject to adjustment for any set-offs or deductions as determined by a final audit to be conducted shortly after completion of the project. *Id.* Because of such contingencies, the Tenth Circuit ruled that the retained amount did not accrue until the audit was concluded and the amount to be received by the taxpayer had been reduced to a fixed and definite sum. *Id.* at 921. The court noted that the taxpayer had not received all of the funds retained, because the audit resulted in certain deductions, which reduced the amount of the retained funds actually released to the taxpayer. *Id.*

Similarly, in *Bizzack,* the court stated "[w]e must determine ... whether there are sufficient contingencies on the ultimate receipt of the retainage to preclude accrual at the point the retainage is invested by the escrow custodian." 1980 WL 4286. There, the taxpayer, a construction company who used the accrual method of accounting, entered into a highway construction contract with the Department of Highways. *Id.* Under the contract, 5 percent of the taxpayer's payments was deposited into a retainage escrow account pending a final determination of the actual amount owed to the taxpayer on the project. *Id.* No amounts were released from the escrow account before the completion of the project and the release was authorized by the Department of Highways. *Id.* The escrow agent was permitted to invest the escrowed funds for the benefit of the taxpayer in federal and state obligations. *Id.* The court held that "[g]iven the existence of [the] conditions, we think neither the receipt nor the investment of the retainage by the escrow custodian sufficiently fixes the contractor's right to the funds so as to require accrual under the all-events test." *Id.* The court also noted that the actual amount of retainage to be released depended on a final determination of the total amount due the contractor under the agreement. *Id.*

The Court concludes that the undisputed facts of this case demonstrate that Southern Family's right to receive the takeout bonus amounts was not fixed at the time they were deposited into escrow. Numerous conditions attached to Southern Family's receipt of the takeout bonuses, including, but not limited to: (1) the requirement that Southern Family remove and maintain a minimum number of policies for the three-year escrow period; (2) the requirement that Southern Family not cancel or non-renew any policies to reduce its risk of hurricane loss; and (3) the requirement that Southern Family only cancel or non-renew fewer than three percent of the policies for other lawful reasons, and was required to accept another policy with similar risk in those cases. Importantly, the JUA did not guarantee that Southern Family would be able to secure a sufficient

number of policies to qualify for the payment of takeout bonuses.

Additionally, similar to *Harmon* and *Bizzack*, the amount of the takeout bonuses could not be determined until the completion of the audits. And the facts reflect that for years 1996, 1998, and 1999, the released amount of takeout bonuses was less than the initial escrowed amount.

Simply put, no determination could be made as to Southern Family's right to the takeout bonuses or the amount thereof until after the three-year escrow period and the completion of the audits. If Southern Family did not meet the contingencies attached to the receipt of the bonuses, the takeout bonus amounts and the interest earned on same remained the JUA's property. Accordingly, as a matter of law, the takeout bonuses and the interest earned on the amounts were not attributable as income to Southern Family until they were released to Southern Family.

The Court notes that the Ernst & Young cases, including, but not limited to, *United States v. Fletcher*, 562 F.3d 839 (7th Cir. 2009), and *United States v. Nackel*, 686 F.Supp.2d 1008 (C.D.Cal.2009), are not "directly on point," as the United States seems to contend in its motion. Indeed, the taxpayers in those cases used the cash method of accounting, which applies the concept of constructive receipt of income, as opposed to the all-events test. *See* 26 C.F.R. § 1.451–1(a).

And even if the Court were to apply the concept of constructive receipt of income [4] to the undisputed facts in this case, the Court would still conclude that accrual did not occur until the release from escrow of the takeout bonuses and interest accrued on same. The United States argues that constructive receipt occurred at the time

the takeout bonuses were placed in escrow because Southern Family's own actions determined whether they would ultimately receive the bonuses. This is wholly unsupported in the record. To the contrary, many of the conditions, as set forth herein, depended on factors outside of Southern Family's control. Moreover, the United States cannot avoid section 627.3511(5)(a), which is further evidence that the takeout bonuses remained the property of the JUA until they were released from escrow.

Because the Court's holding herein is based on a predominant issue of law, and the record on this issue is fully developed, the Court may, in its discretion, enter summary judgment *sua sponte* in favor of Plaintiffs. *See Artistic Entm't v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir.2003). However, the Court will provide the United States fourteen (14) days from the date of this Order to file a response, if it so chooses, discussing why partial summary judgment in favor of Plaintiffs should not be granted on the issue of timing.

It is therefore ORDERED AND ADJUDGED that:

1. Defendant's Motion for Partial Summary Judgment and Supporting Memorandum (Dkt. 246) is hereby DENIED.

2. Defendant's Unopposed Motion for Leave to File Reply Briefs (Dkt. 273) is hereby DENIED AS MOOT.

3. Defendant has fourteen (14) days from the date of this Order to file a response, if it chooses, discussing why summary judgment in favor of Plaintiffs should not be granted. If Defendant does not choose to file such a response within this time period, the Court will enter partial

---

4. However, the Court holds that the concept of constructive receipt does not apply to this case.

summary judgment in favor of Plaintiffs on the issue of timing.